**SCHERING CORPORATION, Plaintiff,**

v.

**PRECISION–COSMET CO., INC., Defendant.**

**Civ. A. No. 83–829–WKS.**

United States District Court, D. Delaware.

July 2, 1985.

Bruce M. Stargatt, Richard H. Morse, Young, Conaway, Stargatt & Taylor, Wilmington, Del., John O. Tramontine, Eric C. Woglom, Jesse J. Jenner, Richard M. Barnes, Douglas J. Gilbert, Fish & Neave, New York City, N.Y., for plaintiff.

Paul E. Crawford, Connolly, Bove, Lodge & Hutz, Wilmington, Del., John D. Gould, Douglas J. Williams, Mark J. DiPietro, Merchant, Gould, Smith, Edell, Welter & Schmidt, Minneapolis, Minn., for defendant.

## OPINION

STAPLETON, Circuit Judge: [1]

This is a patent infringement action brought by plaintiff Schering Corporation against defendant Precision-Cosmet Co., Inc. ("P–C"). On March 11, 1985, a jury returned a general verdict for Schering in the amount of $1,263,482, along with answers to a number of interrogatories. Currently before the Court are motions by both parties. P–C has moved for Judgment Notwithstanding the Verdict ("JNOV") and, in the alternative, for a new trial. Schering has moved for an award of prejudgment interest, increased damages, and reasonable attorney's fees.

### I. MOTION FOR JNOV

The moving party is entitled to a JNOV when the Court is convinced:

**1.** Honorable Walter K. Stapleton, United States Circuit Judge for the Third Circuit, sitting by designation.

(1) that reasonable persons could not in light of ... [the] evidence have found the facts necessary to support the jury's verdict; *or* (2) that the facts properly found cannot in law support that verdict. If, on the other hand, the court is convinced that reasonable persons could have found in light of ... [the] evidence the facts necessary to support in law the jury's verdict, denial of the motion for JNOV is required.

*Weinar v. Rollform, Inc.,* 744 F.2d 797, 805 (Fed.Cir.1984) (citing *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542 (Fed.Cir. 1983)).

■ The Federal Circuit has also set forth guidelines that a court must follow in considering a motion for JNOV. Under these guidelines, a court must:

(1) consider all the evidence; (2) in a light most favorable to the non-mover; (3) drawing reasonable inferences favorable to the non-mover; (4) without determining credibility of witnesses, and (5) without substituting its choice for that of the jury between conflicting elements in the evidence.

*Connell v. Sears,* 722 F.2d at 1546. Further, where as here the issue raised is validity, "the true question is whether [defendant], which bore the burden, 35 U.S.C. § 282, submitted such evidence as would preclude a reasonable jury from reaching a verdict of validity." *Weinar v. Rollform,* 744 F.2d at 805. In this regard, it is well to note that the question presented by a motion for JNOV is *not* whether the district court would have found the invention obvious as though there had been no trial before a jury. *Id.* Rather, the question is whether the jury's verdict that the Schering patent is valid (i.e. has not been proved invalid) is supported by substantial evidence. *Id.* (citing *Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp.,* 739 F.2d 604 (Fed.Cir.1984)).

Notwithstanding these principles, P–C argues that the trial court may review the issue of validity de novo. In so doing, P–C relies upon the Federal Circuit's recent statement in *E.W.P. Corp. v. Reliance Universal, Inc.,* 755 F.2d 898, 905 (Fed.Cir. 1985), that validity "is a question of law and that question is freely reviewable by this court." *E.W.P. Corp.,* however, was not tried before a jury. In *Connell v. Sears,* the court explained that though obviousness is indeed a question of law, it is an issue that may properly be submitted to a jury, in the same manner that other legal questions, such as negligence, are regularly submitted to juries in personal injury cases. 722 F.2d at 1547; *Railroad Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506, 1514–15 (Fed.Cir.1984). Thus, though P–C is clearly correct that obviousness is a question of law, it is equally clear that when faced with a motion for JNOV concerning a verdict of validity, consideration of that motion by the trial court is limited by the standard of review and guidelines set forth in *Connell v. Sears* and *Weinar v. Rollform.*

### A. The Obviousness Issue

The parties agree, for purposes of the motion for JNOV and a new trial, that the claimed invention is a gas permeable hard contact lens made principally of tertiary butyl styrene ("TBS"). P–C contends that such an invention would have been obvious to one with ordinary skill in the art in light of seven items of prior art, only one of which was before the Patent Examiner: (1) the Fatt article (DX–212AG); (2) Larke & Tighe U.K. Patent No. 1,394,056 (DX–212M); (3) Gaiser U.S. Patent No. 2,674,743 (DX–212B); (4) the Salame article (DX–212H); (5) Lundberg U.S. Patent No. 4,057,598 (DX–212C); (6) the Dow brochures (DX–212AH, DX–212AI), and (7) Larke U.K. Patent No. 1,395,501 (DX–212N).

Defendants contend that the above prior art paved a clear path to the inventor's decision to substitute the higher alkyl styrenes, including TBS, in a hard contact lens formulation, in order to provide improved gas permeability.

■ I conclude, however, that there is substantial evidence in the record supporting the conclusion that the subject matter of the invention of the Schering patent

taken as a whole would not have been obvious at the time the invention was made to a person of ordinary skill in the art.

A principal contention made by P–C with respect to the question of obviousness is that the high gas permeability of a TBS lens would be predicted in 1977 on the theory that the addition of bulkier side groups to a polymer creates a more "open structure" (lower density) for the passage of oxygen. P–C presented the testimony of Dr. Salame for purposes of explicating this theory. Both of Schering's experts, however, expressly opined that the higher permeability of TBS would not have been predictable and provided reasons for their opinions. Dr. Hoehn expressly stated that the permeability of TBS was not predictable. (Tr. 1620). He explained that, contrary to Dr. Salame's theory, permeability of a material is not a property of the polymer; it is instead a property of the article made from the polymer. (Tr. 1618). According to Dr. Hoehn, predicting permeability with any degree of success depends on whether one has studied the article made from the polymer. *Id.*

Dr. Fatt testified that he would not be able to predict increased permeability of a polymer merely on the basis that bulkier side groups were added. (Tr. 343). Dr. Fatt opined that gas permeability was predicted upon two components—the speed at which the molecule traveled through the plastic and the solubility of the gas in the plastic—and that these components could offset one another with the result that addition of a bulkier group would not necessarily lead to increased permeability. (Tr. 343). He also indicated that the lower density of a polymer did not always lead to increased permeability. (Tr. 342).

Dr. Fatt further testified that the increased permeability of ethyl, isopropyl and tertiary butyl styrene over stryene and methyl styrene was unexpected. (Tr. 270–71). Mr. Deichert of Bausch & Lomb also acknowledged that the permeability of TBS was "surprising and unexpected". (Tr. 1093).

P–C contends that the Larke & Tighe patent (DX–212M) teaches one skilled in the art that the addition of bulkier side groups, by providing more open space, will improve oxygen permeability. P–C's reference here is not to any teaching concerning the compositions claimed in the Schering patent but, rather, to the following language of the Larke & Tighe patent:

Although the invention is not limited to any particular theory, it is believed that the bulky side groups attached to the polymer chain disrupt the chain symmetry and regularity of the polymer giving a more open structure having increased gas permeability.

Given the contrary testimony of Dr. Fatt and Dr. Hoehn as to the understanding of those working in the art at the relevant time, the jury was not bound to conclude that the artisan of ordinary skill would take this theoretical speculation at face value. Testimony to the contrary by Drs. Hoehn and Fatt represented substantial evidence that increased permeability was not predictable.

Dr. Fatt further testified that the use of TBS in a hard contact lens would not have been obvious to him from the Lundberg patent (DX–212C). He explained that the patent disclosed TBS as one of 25 to 30 monomers for the hydrophobic block of a copolymer and that one of the 25 possible uses for the copolymer was a soft, not *hard,* contact lens. He indicated that there was no mention of gas permeability in Lundberg. (Tr. 279–293). He explained that out of the many possible combinations of uses with different monomers, disclosed by Lundberg, it would not have been obvious to pick out the use of TBS in a soft lens, let alone in a hard one. (Tr. 292).

As to the Gaiser patent (DX–212B), Dr. Fatt indicated that neither TBS nor any other alkyl styrene claimed in the Schering patent is mentioned in Gaiser. (Tr. 297). Moreover, both Drs. Fatt and Salame testified that the substituted styrenes referred to by Gaiser constituted a class of more than one hundred compounds. (Fatt Tr. 297–98; Salame Tr. 1271–72). Most signifi-

cantly, Fatt testified that Gaiser did not mention anything with respect to the improved gas permeability that resulted from the use of certain substituted styrenes. (Tr. 297).

While Dr. Salame testified that the increased permeability of TBS would have been obvious, the jury was entitled to reject his testimony if they did not find it credible. And it is not the province of this Court to weigh the credibility of Salame's testimony against the testimonies of Hoehn and Fatt. *Connell v. Sears,* 722 F.2d at 1546–47.

The question here is whether P–C, in light of its burden to prove invalidity by clear and convincing evidence, submitted such evidence as would preclude a reasonable jury from reaching a verdict of validity. I conclude that it did not and that the jury's conclusion on obviousness was supported by substantial evidence.

### B. *Anticipation*

P–C argues that the Gaiser patent, which teaches that contact lenses can be made of styrene or substituted styrenes, anticipates a number of the asserted claims of the Schering patent. P–C points to the testimony of Dr. Fatt and Dr. Loshaek. Dr. Fatt testified that he would have understood the reference to substituted styrenes in the Gaiser patent to mean divinyl benzene. (Tr. 295–296). He also indicated that a contact lens of divinyl benzene, having a substantial amount of ethyl styrene as an impurity, would come within the language of claim 1 of the patent-in-suit. Dr. Loshaek testified that the term "substituted styrenes" could mean the styrenes he had been testifying about, including TBS. (Tr. 1460–61).

Dr. Fatt also testified, however, that neither TBS, isopropyl styrene, ethyl styrene, nor any other substituted styrene are mentioned in the Gaiser patent. (Fatt 295–297). Dr. Fatt also stated that Gaiser did not mention gas permeability with respect to substituted styrenes. (Tr. 297). In addition, both Drs. Fatt and Salame testified that the class of substituted styrenes in-

cludes more than one hundred compounds. (Fatt Tr. 297–298; Salame Tr. 1271–72).

As recently stated by the Federal Circuit:

A party asserting that a patent claim is anticipated under 35 U.S.C. 102 must demonstrate ... identity of invention. In cases like this, identity of invention is a question of fact, and one who seeks such a finding must show that each element of the claim in issue is found, either expressly described or under principles of inherency, in a single prior art reference, or that the claimed invention was previously known or embodied in a single prior art device or practice.... (citations omitted).

*Kalman v. Kimberly-Clark Corp.,* 713 F.2d 760, 771–72 (Fed.Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984).

■■■ The general rule is that a prior genus does not anticipate a later species. I Chisum, *Patents* § 3.02[2] (1985); *see In re Ruschig,* 343 F.2d 965 (C.C.P.A.1965). If, however, it is possible to derive a class of compounds of lesser scope than the genus disclosed in a prior art reference on the basis of preferences ascertainable from the remainder of the reference, anticipation may be found. *E.g., Application of Schaumann,* 572 F.2d 312, 316 (C.C.P.A. 1978); *In re Petering,* 301 F.2d 676, 681 (C.C.P.A.1962). The anticipating reference must contain within its four corners a sufficient description to enable one to practice the invention without experimentation or inventive skill. *Phillips Elec. & Pharmaceutical Indus. Corp. v. Thermal & Elec. Indus., Inc.,* 450 F.2d 1164, 1169 (2d Cir. 1971); *Dewey & Almy Chem. Co. v. Mimex Co.,* 124 F.2d 986, 990 (2d Cir.1942); I Chisum, *Patents* § 3.04[1][6] (1985). *See CBS v. Sylvania Electric Prod., Inc.,* 415 F.2d 719, 725 (1st Cir.1969) (test is whether the prior art reference "describes the invention with sufficient clarity and specificity so that one skilled in the art may practice the invention without assistance from the patent claimed to have been anticipated.")

Based on these principles, I conclude that there was substantial evidence in the present case from which a reasonable jury could conclude that Gaiser did not anticipate the various claims of the Schering patent. Indeed, given the text of the Gaiser patent and the undisputed evidence with respect to the number of compounds coming within the class of substituted styrenes, it is difficult to understand how the jury could have concluded otherwise. Gaiser does not mention any particular substituted styrene, makes no references to the permeability of specific substituted styrenes, and provides no basis whatever for preferring any sub-group of substitute styrenes over other substituted styrenes for use in making contact lenses. Given the fact that substituted styrenes comprise a class in excess of one hundred compounds, it seems clear that the elements of the claimed invention, namely TBS, were not adequately described by Gaiser for purposes of identification; and that one of ordinary skill in the art would have had to engage in extensive experimentation to get from Gaiser to the Schering invention.

*In re Petering* and *In re Schaumann*, cases relied on by P–C, both involved situations where a reference disclosing a broader group of compounds was narrowed to a small, definite and limited class of compounds by preferences expressed in the remainder of the disclosure. In the present case, there was evidence indicating that Gaiser would not have pointed one toward a more limited class of substituted styrenes, such as, for example, the alkyl styrenes disclosed by the patent-in-suit.

## C. *New Use For Old Substance Issue*

P–C argues that as a matter of law claims 1, 15, 18, 21, 25 and 27 are invalid as reading on a homopolymer of TBS, which is admittedly an old composition. P–C predicates its argument upon the well-established doctrine that a new use for an old substance is not patentable. *In re Thuau*, 135 F.2d 344 (C.C.P.A.1943). Thus, P–C argues that the terms "contact lens" and "buttons" appearing in the preambles of the various challenged claims merely describe a new use for TBS.

I conclude, however, that rather than merely claiming a new use for TBS, the Schering patent discloses a new composition *made* from TBS, i.e., a hard gas permeable contact lens or button. In *Thuau*, the applicant attempted to claim a compound that he had failed to "change in any way." *Id.* at 347. Here, the Schering patent discloses more than the mere chemical composition TBS; it claims contact lenses that have been cut and shaped from the raw compound itself. Such a modification is legally significant and prevents the challenged claims from falling under the doctrine of *In re Thuau*.

"The rule that no product patent may issue for discovery of a new use for an old product or process is tempered by the 'doctrine of slight changes.'" Chisum, I *Patents* § 1.03[8][b] at 1–171 (1985). The doctrine of slight changes extends to the area of chemical compounds. *Id.* at 1–174. That the modification of an old compound into a new patentable one may indeed be slight is illustrated by *Application of Wiggins*, 397 F.2d 356 (C.C.P.A.1968).

Wiggins sought to patent a compound (referred to by the court as $0_2$) because of its analgesic and pain relieving activity in humans. One of Wiggins' claims rejected by the examiner and Board of Appeals prescribed a dosage of $0_2$ from "about 10 milligrams to about 1000 milligrams." *Id.* at 358. The prior art consisted of an article by Wolf describing the exact same compound and its use in protecting mice from x-ray radiation. Wolf did not suggest the use for $0_2$ discovered by Wiggins, nor did Wolf suggest administering $0_2$ in the 10 to 1000 milligram range disclosed by Wiggins. The Board of Appeals rejected the application on the ground that Wiggins had "discovered a new use for an *old* composition." *Id.* at 359 n. 5 (emphasis supplied by Board). The court disagreed, finding that Wiggins had discovered a new composition since the amounts of $0_2$ employed by Wiggins in his composition were different from

the amounts that Wolf had administered in his experiments. *Id.* at 359–60.

In light of *Wiggins,* wherein a mere change in the *amount* of a compound was deemed sufficient to change an old composition into a new one, it would appear to follow that the transformation of TBS into a contact lens involves the creation of a new composition.

In arguing to the contrary, defendants rely heavily upon *Application of Benner,* 174 F.2d 938 (C.C.P.A.1949). In that case, the applicant argued that he had changed the shape of the compound at issue. The court rejected this argument because the applicant had failed to describe the purported change in shape in the claims of the patent. *Id.* at 942–43. Moreover, the court refused to recognize the introductory phrases of the challenged claims—which recited a "ball mill lining element"—for purposes of showing that the compound described in the claims had been shaped into a particular article, i.e., a new composition. P–C similarly argues that the challenged claims of the Schering patent, as distinct from their preambles, merely describe TBS, and that Schering cannot use the preambles, which describe contact lenses and buttons, to further limit what is already defined by the claims themselves.

After *Benner,* the Court of Claims and Patent Appeals in *Kropa v. Robie,* 187 F.2d 150 (C.C.P.A.1951), set down guidelines for determining when the introductory phrase of a claim would be permitted to limit the claim itself. The court indicated that the preamble would be permitted to limit a claim where it "was deemed essential to point out the invention defined by the claim or count," that is, where "the preamble was considered necessary to give life, meaning and vitality to the claims or counts." *Id.* at 152. The court performed an exhaustive analysis of prior precedent and found *inter alia:*

> The preamble is a limitation where it specifies an article or composition in which there inheres a field of specific use, and the constituents of the article which are recited in the portion of the

count following the preamble are old compounds not theretofore known to be useful in such an article.

*Id.* at 159. The Court of Appeals for the Federal Circuit has continued to look to the preamble when "necessary to give meaning to the claim and properly define the invention." *Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 896 (Fed.Cir. 1984), *cert. denied,* — U.S. —, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984).

In the present case, the words "contact lens" and "button" are essential to point out the invention defined by the claims. It is only by reference to the introductory phrase of the challenged claims that it can be known that the subject matter defined by the claims is comprised as a contact lens or as a button adapted to be formed into a lens. In so holding, I note that "claims should be so construed, if possible, as to sustain their validity." *ACS Hosp. Systems, Inc. v. Montefiore Hosp.,* 732 F.2d 1572, 1577 (Fed.Cir.1984).

### D. *Structural Similarity*

P–C contends that a hard contact lens of TBS was obvious because TBS is an "isomeric homolog" of the prior art styrene or methyl styrene hard contact lenses.

While it is true that close structural similarity between prior art compounds and those that are claimed may be an indicia of obviousness, the subject matter of the invention as a whole may be non-obvious if the claimed compound has unexpected properties. *Application of Payne,* 606 F.2d 303, 314 (C.C.P.A.1979); *In re Papesch,* 315 F.2d 381 (C.C.P.A.1963).

In the present case, the jury was presented with substantial evidence upon which it could reasonably have concluded that a lens of TBS had such unexpected properties as to rebut any inference that might be drawn from structural similarity. Dr. Fatt, for example, testified that the two alkyl styrenes preferred by the Schering patent, TBS and isopropyl styrene, as well as ethyl styrene, all demonstrated unexpected increases in gas permeability over

**1376**

the prior art styrene and methyl styrene. (Fatt Tr. 270–71).

## II. MOTION FOR A NEW TRIAL

P–C moves in the alternative for a new trial on the grounds that (1) the verdict with respect to a number of issues is against the weight of the evidence; (2) the damages are excessive; and (3) errors in certain of the jury instructions prejudiced defendant's case.

A motion for a new trial differs from a motion for JNOV in that:

> A motion for a directed verdict or for judgment n.o.v. raises the legal sufficiency of the evidence, and is to be sharply distinguished from a motion for a new trial on the ground that the verdict is against the weight of the evidence. The latter motion is addressed to the sound discretion of the trial court, which may set aside the verdict as contrary to the preponderance of the evidence although a directed verdict or judgment n.o.v. is not justified (footnote omitted).

6A J. Moore, *Moore's Federal Practice* § 59.08(5) (2d ed. 1984) (hereinafter Moore, *supra* ). The standard of review in considering a motion for a new trial is most often formulated in one of three ways. Thus, a new trial will be granted if the verdict is against the *clear* weight of the evidence, *Shatterproof Glass Corp. v. Libbey-Owens Food Co.,* 758 F.2d 613, 626 (Fed.Cir.1985); 6A Moore, *supra* § 59.08(5) (emphasis added), or if the court is convinced the jury has reached a "seriously erroneous result," *Herman v. Hess Oil Virgin Islands Corp.,* 379 F.Supp. 1268, 1271 (D.V.I.1974), *aff'd,* 524 F.2d 767 (3d Cir.1975), 6A Moore, *supra,* § 59.08(5), or if there has been a miscarriage of justice. *Parsons v. Doctors For Emergency Services,* 81 F.R.D. 660, 662 (D.Del.1979); Moore, *supra* § 59.08(5).

### A. *Infringement By Saturn II Lens*

■ P–C contends that the jury's finding of infringement of the Schering patent by the Saturn II lens is against the weight of the evidence. P–C argues that the Saturn II, because of its soft skirt, is funda-mentally different from the hard contact lens claimed by the Schering patent and could not have infringed the Schering patent either literally or under the doctrine of equivalents. I conclude, however, that the clear weight of the evidence does not warrant overturning the jury's finding of infringement with respect to the Saturn II.

P–C admits that the Saturn II lens is characterized by a hard center. Dr. Fatt testified that the portion of the Saturn lens that its wearer looks through is hard, and that, as far as vision is concerned, the Saturn II is a hard contact lens. (Fatt Tr. 385). P–C admits (Def. Br. 36) that the hard portion of the Saturn II functions to correct astigmatism and there was testimony during trial that one of the advantages of the hard lens over the soft is that the hard lens corrects astigmatism.

Since the asserted claims of the Schering patent are not closed, the addition of the soft skirt to the hard center of Saturn II did not preclude a finding of literal infringement by the jury. In addition, the jury was entitled to conclude that Saturn II infringed under the doctrine of equivalents—especially in light of Dr. Fatt's testimony.

I am not persuaded that the verdict of infringement was clearly not based upon a preponderance of the evidence, or that there has been a miscarriage of justice with respect to this issue.

### B. *The Question Of Validity*

P–C submits that for the same reasons it is entitled to a JNOV on the issues of obviousness and anticipation, it is alternatively entitled to a new trial on those issues on the ground that the jury's verdict is against the weight of the evidence. Having already discussed much of the relevant testimony and evidence with respect to this matter, I need not repeat it here.

Suffice it to say that I am unable to conclude that the jury's determination respecting validity was contrary to the clear weight of the evidence.

## C. *Damages*

P–C contends that Schering failed to satisfy its burden of showing what a reasonable royalty would be, and that the jury's award is excessive and against the weight of the evidence.

Schering introduced evidence as to what would be a reasonable royalty for P–C's infringement through the testimony of Dudley Smith, an expert on patent licensing. Basically, Mr. Smith concluded that after a hypothetical licensing negotiation, the parties would have agreed to a 50/50 split of profits which he translated into a royalty based upon 30% of the gross projected sales prices for all lenses made by P–C. P–C did not challenge Mr. Smith's credentials or experience at trial and he is clearly a well qualified expert on licensing. Notably, P–C did not offer the expert testimony of any licensing witness of its own.

Mr. Smith provided extensive testimony explaining how he arrived at his recommended reasonable royalty. He explained that the procedure for determining a reasonable royalty is to assume a hypothetical negotiation between a willing licensor and willing licensee who are attempting to agree on a reasonable royalty rate for a license under the patent-in-suit. Smith constructed the hypothetical negotiation by using what he considered a generally recognized royalty rate for patent licenses and then considering the effect of numerous factors that might increase or decrease the initially chosen rate. Smith evaluated the effect of approximately seventeen factors in forming his opinion as to an appropriate royalty. (Tr. 584–618).

Defendant argues essentially that Smith's opinion is unsupportable when viewed against the evidence relating to (1) other licenses in the contact lens field; (2) established royalty rates in the optical and chemical industries; and (3) other gas permeable lenses on the market.

P–C's first argument is that it produced uncontroverted evidence of royalty rates currently in place in the contact lens industry, i.e., the Erickson agreement (DX–256),[2] which provides a royalty rate of 5% on net sales, and the Bausch & Lomb agreement, which provides a 10% royalty of net sales on the sale of Saturn II lenses by B & L (5% to P–C and 5% to Erickson). (DX–135). P–C further points to a number of statements by Smith that P–C claims undermine his opinion concerning the royalty that ought to apply to the present case. According to P–C, Smith allegedly agreed with a statement from the Finnegan article that most royalty rates are 5 to 6% based on net sales, he admitted that seldom do licensees use profit as a basis for calculating royalties, and also agreed with a statement that in the optics and chemical fields royalties are based upon net sales, not gross profits, and that royalties range from 2% to 5%.

With respect to the Erickson agreement, upon which P–C particularly relies in pressing its motion for a new trial on the issue of damages, Smith testified that it was not "analogous" to the agreement that would have been hypothetically negotiated between Schering and P–C. Smith indicated that under the *Georgia Pacific* analysis the patent at issue is assumed valid and infringed during negotiations. The consequence of this assumption is that the royalty tends to increase. (Tr. 587, 687). Smith distinguished Erickson on the ground that it did not involve a patent presumed to be "invalid and infringed." (Tr. 687).

Moreover, while the Erickson agreement licensed P–C under Erickson's patent, it did so at a time (1977) when the Saturn lens had a PMMA center and was years away from being ready for submission to the FDA with a TBS center (which P–C did not do until 1984), and thus was far less valuable to P–C than a license in July 1981 under Schering's patent. In addition, the royalty under the Erickson agreement was accompanied by a substantial fixed payment (DTX–256), and there is no evidence that Erickson was ever a gas permeable hard contact lens supplier so that P–C would be a competitor of Erickson. Smith

---

**2.** This agreement provided for the transfer to P–C of the Saturn lens technology from Erikson.

indicated that each of these factors would have a substantial impact on the royalty rate.

P–C's claims that Smith agreed with actual statements from the Finnegan article relating to the rate of typical industry royalties and the rate of royalties in the field of optics and chemicals are belied by the record. Smith testified that he could *not* agree with the proposition that common industry royalty rates were 5–6% of net sales for two reasons. First, he had not seen the survey on which the statement was based, and second he explained that the statement of typical rates does not show whether a patent license is involved "let alone a patent that had been held valid and infringed." (Tr. 272). Smith was also unable to agree with the statement concerning typical royalty rates in the chemical and optics industries. He explained that the statement was too broad, and that he would need to know what type of license was being referred to, since royalty rates varied according to the nature of the license. (Tr. 677–78).

Moreover, there was testimony by Smith relating to the Finnegan article that actually supported his calculations of a reasonable royalty. He indicated that the 5% royalty rates based on net sales referred to in the Finnegan article related to "commercial cases where ... none of the patents have been held valid and infringed." He pointed out on the other hand that Finnegan described a case where "the Court awarded a reasonable royalty which equalled forty-eight percent of the patent infringer's profits." (Tr. 714).

Smith also testified at several points explaining why he calculated his royalty based on projected gross sales of all manufactured lenses rather than net sale of units sold as advocated by P–C. (Tr. 706–709; 1805–1807).

Finally, P–C argues that the rate recommended by Smith was unjustifiably high since the Airlens did not constitute an extraordinarily unique product giving a competitive advantage to the licensee. This factor was, of course, one of many that the jury was free to consider in determining the appropriate royalty. But even if, as P–C contends, the value of the Airlens to a hypothetical licensee was reduced in 1981 because the lens market was occupied by numerous competitors, I am not persuaded that this factor, alone or in combination with any others cited by P–C, constituted evidence that clearly rebutted Smith's testimony.

Thus, while the burden was on Schering to prove damages by a "reasonable probability", *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 555 (Fed.Cir. 1984), I conclude from the foregoing that Schering successfully and persuasively carried this burden. Virtually all of the arguments that P–C now raises with respect to the evidence were addressed and rebutted by Smith. The jury was free to credit his testimony and it is not surprising that it did so given the fact that no expert testimony was offered to contradict his views.[3]

### D. *Jury Instructions*

In support of its motion for a new trial, P–C asserts that there were a number of errors of omission and commission in the instructions given to the jury. I remain of the view that the jury was adequately and correctly instructed regarding the applicable law and further conclude that, in the one area open to reasonable debate, any error that may have crept into the charge would not warrant a new trial.

The parties are in agreement as to the standard of review of jury instructions on a motion for a new trial:

> Instructions must be viewed in their entirety. A new trial is permissible when it is clear that error in the instructions as a whole was such as to have misled the jury.

*Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1518 (Fed.Cir.1984). In addition, the error must prejudice the defend-

---

**3.** *See Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed.Cir.1983) (discussing the failure of defendant to counter plaintiff's expert license witness with one of its own).

ant's case. *Shatterproof Glass*, 758 F.2d at 627.

### 1. *"Likely To Carry Burden"*

I declined to give the following instruction requested by P–C:

> If you find that the additional prior art relied on by defendants is more pertinent than the prior art referred to by the Patent Office during the consideration of the application for the Schering patent, then defendants are more likely to carry their burden of proof that the patent is invalid.

This requested instruction takes a comment of the Federal Circuit regarding what juries are likely to do in certain situations and attempts to convert it into a proposition of law. In my judgment, it would have been more likely to confuse the jury than to help it understand the applicable law.

In addition to being given an explanation of the patent system and what happens in the Patent Office, the jury was correctly instructed that it was required to determine, with respect to each claim, whether the evidence as a whole showed clearly and convincingly that the subject matter of the invention would have been obvious to one of ordinary skill in the art given the prior art. The vast majority of the evidence tendered at trial was relevant to this issue. One piece of such evidence was that certain of defendant's prior art references were not before the Patent Office when it decided that the statutory requirement of nonobviousness had been met. While P–C chose not to do so, it was free to stress this particular fact to the jury in closing argument. It was not entitled, however, to have the judge single this fact out and tell the members of the jury that it meant that P–C was "more likely" to have carried its burden of proving obviousness. The relevance and importance in any particular case of evidence tending to show that some prior art references were not before the PTO will depend upon the jury's view of the other evidence bearing on the obviousness issue.

### 2. *Presumed Knowledge*

P–C complains that the Court failed to charge the jury regarding a presumption that "a hypothetical ordinary person skilled in the art has knowledge of all the art relied on at trial even if the patentees were actually unaware of that art." One problem with this contention is that it does not appear that P–C actually requested an instruction to this effect.

Defendant's "Request For Instruction 19A" requested the following: "You must presume the inventors were aware of all the art, whether or not they were in fact aware of it at that time." In a letter to the Court dated March 7, 1985, P–C requested a slightly different construction: "You must presume that the inventors were aware of all of the relevant art which existed at the time they made the invention, irrespective of whether they personally knew of it." The presumption that the *inventor* has knowledge of all the art has been rejected by the Court of Appeals for the Federal Circuit. *Kimberly-Clark v. Johnson & Johnson*, 745 F.2d 1437, 1454 (Fed.Cir.1984) ("We hereby declare the presumption that the inventor has knowledge of all material prior art to be dead.") There can, therefore, be no error in this Court's failure to adopt the above two requested instructions.

Second, at the prayer conference P–C failed to make any request with regard to knowledge of the ordinary person skilled in the art. Under F.R.Civ.P. 51, P–C has waived any objection based on that omitted instruction.

Finally, even if the instruction had been properly requested and improperly denied, I would be unable to conclude that the error was such as to mislead the jury and prejudice the defendant. P–C is specifically concerned about Salame's Permachor System, since there was testimony from some of Schering's witnesses that persons in the art may not have been aware of that system. (Tr. 176–77, 1613). However, the jury was specifically instructed that Salame's Permachor system was part of the "stipulated or agreed upon prior art."

(Charge to the Jury, p. 16). The jury was further instructed that, on the issues of obviousness and anticipation, they were to "consider each patent or publication which has been agreed to be prior art." (Charge to the Jury, p. 25). Finally, the Court defined prior art for the jury as "the knowledge that was previously available to the public" (*id.* at 15)—not art available to only certain individuals.[4]

Based on the above, I am confident that the jury was not misled as to the scope and content of the prior art or as to their duty to compare each claim of the patent-in-suit with all of P–C's prior art references.

### 3. *Old Composition For New Use*

In addition to claiming as a matter of law that six claims of the Schering patent are invalid because they merely disclose a new use for an old compound, *see* section I.C., *supra,* P–C also contends that it was entitled to an instruction submitting this defense to the jury.

I have already concluded, however, that as a matter of law the Schering claims disclose a new composition. Therefore, P–C was not entitled to an instruction submitting this defense to the jury.

### 4. *Deichert's Work*

In support of its motion for a new trial, P–C complains of the instruction of the Court regarding claims 18, 27 and 29 of the Schering patent and the issues of whether they were anticipated by Mr. Deichert's work at Bausch & Lomb during August and September of 1977. In support of this contention, P–C relies upon the assertion that "an inventor need only appreciate the *existence* of the subject matter of his in-

vention, but need not fully appreciate all of the functions or advantages that make it patentable." I do not disagree with this proposition; I do not think it applicable, however, to the issues of whether Deichert's work anticipates claims 18, 27 and 29.

The subject matter of claims 18, 27 and 29 is "an optically clear, non-hydrophilic contact lens" (or a "button adapted to machine" such a lens) having "a gas permeability constant of at least about $10 \times 10$–$11''$ and being made of a polymer produced by polymerizing 70% to 100% TBS monomer, 0% to 10% "compatible cross-linking monomer" and 0% to 20% "compatible plasticizer."[5] While I acknowledge, in retrospect, that the matter is not free from doubt, I charged as I did with respect to these claims because, on the record before me, I regarded the presence of a DK value of at least 10 as well as the presence of at least 70% TBS to be part of the definition of the subject matter of these claims and not an inherent characteristic of an invention defined by the other portions of the claims. From this perspective, in order to find the inventions of these claims anticipated by Deichert, the jury would have to conclude not only that Deichert made a lens coming within the scope of the claims, but also that he appreciated that he had done so. This would include an appreciation that his 70% plus TBS lens had a DK value in excess of 10. This was significant because there was evidence that Deichert had never tested his lens for gas permeability.

---

4. The Court had previously instructed the jury at the outset of the trial as follows:

So when we ask ourselves whether the invention described in the patent is new and whether it was obvious, given what had been learned earlier by others, we compare the patent with the prior art, we compare the patent with the pre-existing patents and publications in the same area that reflect what others had learned and discovered before.

The prior art is what was previously available to the public and those practicing this art, and this is what is important. It does not matter whether or not it is shown that the

inventor of a patent knew about or received aid from the prior art and what others had discovered.

In order to have a valid patent, somebody has to be able to show that they added something of value to what was previously available to the public.

5. As is clear from the wording of the claims, the percentage of TBS and cross-linking monomer are based on the total weight of the polymer and the percentage of plasticizer is based on the total weight of the polymer and plasticizer.

The charge as given was intended to comport with the teachings of *Silvestri v. Grant*, 496 F.2d 593 (C.C.P.A.1974) and *Knorr v. Pearson*, 671 F.2d 1368 (C.C.P.A. 1982). If the gas permeability constant of $10 \times 10\text{-}11$ be regarded as an inherent characteristic of the invention otherwise defined in claims 18, 27 and 29 and these cases are to be distinguished on that basis, it still would not follow, however, that P–C is entitled to a new trial with respect to these claims. I say this because if the jury found, as it did, that P–C had not carried its burden of proving that Deichert's work anticipated the broader subject matter of the other claims-in-suit, it follows, *a fortiori*, that it did not carry its burden with respect to claim 18, 27 and 29. In this connection, it seems to me that the jury's finding of no anticipation of the other claims strongly suggests, and perhaps requires, a finding that the subject matter of the claims of the Schering patent are limited to hard contact lenses and that Deichert was found by the jury to have worked solely with soft contact lenses.

### 5. *Infringement*

P–C's final objection to the Court's charge is that it was erroneous to permit the jury to consider the performance characteristics of Schering AIRlens.

The Court's charge stated that Schering had the burden of proving that the accused lenses and buttons infringe the claims of the Schering patent. (Tr. 1901). The Court further instructed the jury at least four times that they should determine infringement by comparing the claims with the accused product. (Tr. 1896, 1901, 1902 and 1904).

With regard to the doctrine of equivalents, the Court instructed the jury:

In order for the doctrine of equivalents to apply, however, each element of the claimed invention or its substantial equivalent must be found in the accused product. And the claimed invention and the accused product must perform substantially the same function in substantially the same way to yield substantially the same result.

\* \* \* \* \* \*

Now, as I have already explained to you, the test of infringement is whether the claims of the patent cover the accused device so that the accused products are to be compared with the claims of the Schering patent and not with the plaintiff's product, the AIRlens.

However, if you reach this issue of whether the accused product and the claimed invention perform substantially the same function in substantially the same way to yield substantially the same result, and if you believe that the AIRlens, the plaintiff's product, comes within the scope of the claims of the patent, you may consider the evidence of Schering which compared the performance characteristics of the Airlens with those of the Opus III and Saturn II.

*Id.*, p. 11, Tr. 1904–05.

In this context, it was not error to give the jury permission to consider the performance characteristics of the AIRlens on the issue of equivalents in the event it concluded that the AIRlens was an embodiment of the invention described in the claims of the Schering patent.

## III. SCHERING'S MOTIONS

### A. *Increased Damages*

In addition to its general verdict for Schering, the jury answered a number of interrogatories and found, *inter alia*, that P–C had willfully infringed each of the asserted patent claims. Schering now moves for an award of increased damages pursuant to 35 U.S.C. § 284.

In *Underwater Devices, Inc. v. Morrison-Knudson Co.*, 717 F.2d 1380, 1389–90 (Fed.Cir.1983), the court upheld a treble damage award based on a finding of willful infringement and stated:

Where, as here, a potential infringer has actual notice of another's patent rights, he has an affirmative duty to exercise due care to determine whether or not he is infringing. Such an affirmative duty

includes, *inter alia*, the duty to seek and obtain competent legal advice from counsel *before* the initiation of any possible infringing activity. (Citations omitted). More recently, the Federal Circuit has recognized that while counsel's opinion with respect to a patent is evidence of good faith, it is not dispositive, and it is necessary to look at the totality of circumstances presented by a case in determining whether infringement is willful. *Central Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1577 (Fed.Cir.1983). The Federal Circuit has also indicated that "willfulness may include a determination that the infringer had no reasonable basis for believing it had a right to do the acts." *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1548 (Fed.Cir.1984) (citing *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1565 (Fed.Cir.1983)).

In the present case, the jury had before it the following evidence of willfulness. P–C knew of Schering's patent prior to P–C's application to the FDA in July 1981 for approval to sell the Opus III contact lenses. (Tr. 898–899). P–C had consulted with counsel concerning the question of infringement of the Schering patent prior to the July 1981 FDA application. (Tr. 432–435). The issue of infringement was discussed at the July 1981 meeting of Frigitronic's Board of Directors and is reflected in the following statement taken from the minutes of that meeting:

> Mr. West presented an article stating the opinion that gas permeable hard lenses are the product of the future. Our OP346[**] has the highest oxygen permeability of all lenses aside from the silicones. It can be manufactured in our present facility. However, we may be infringing a patent application.

(PTX–84, p. 4). Mr. Ralph E. Crump, President of Frigitronics, Inc., testified that he "assume[d]" that the patent application referred to in these minutes was the Wesley-Jessen (Schering) patent. (Tr. 437–39).[6] There was also evidence that in May-June 1981, P–C made a "blind inquiry" to determine whether Schering would be willing to grant a license under its patent. To conceal its identity while making this inquiry, P–C hired a lawyer from Chicago to contact Schering, so that Schering would not suspect that the call came from P–C or P–C's counsel, both of whom were located in Minneapolis. (PX–51, 52, 53; Schmidt Tr. 1700; West Tr. 1699). Finally, there was evidence that as of May 1984, P–C continued to receive advice from counsel that it was infringing the patent-in-suit. As stated in the May 15, 1984 minutes of the Board of Directors:

> Our attorneys have said we must invalidate the Schering patent in order to win this case, since otherwise we would be infringing. They say we have a 60–70% chance based on prior art. (PX–88).

Notwithstanding this evidence that P–C knew it might be infringing Schering's patent, P–C tendered no evidence that it had obtained an opinion from competent counsel analyzing and evaluating the validity of the Schering patent.

█ In light of the foregoing, my views are in accordance with those of the jury respecting the issue of willful infringement. P–C was on notice from mid-1981 that it was probably infringing the Schering patent. Yet, P–C came forward with little in the way of demonstrating that it relied in good faith upon competent opinion of counsel as to the invalidity of the Schering patent. While P–C apparently had been advised by its attorneys that there was a "60–70% chance" of invalidating Schering's patent, this opinion does not satisfy the criteria for reasonable reliance spelled out in *Underwater Devices*, 717 F.2d at 1390 (Memorandum containing "only bold, conclusory, and unsupported remarks regarding validity" is inadequate). Additionally, the May 1984 Statement would appear to have come too late for purposes of demonstrating good faith. An organization on notice that it is infringing another's patent should inquire into the

---

6. The parties agreed that any statement or admission made by Frigitronics would be binding on P–C as if it had been made by P–C itself (see Charge To The Jury, March 11, 1985, p. 2).

validity of the patent *before* rather than *after* the alleged infringing activities begin. *Underwater Devices,* 717 F.2d at 1390 (emphasis supplied by court).

■ Since I am in agreement with the jury that Schering made out its case of willful infringement, I will award Schering double damages. I have decided to double the damages rather than treble them for three reasons. First, this is not a case where a successful patented product is introduced to the market and is later copied by the alleged infringer. P–C presented testimony that it had been developing its contact lenses for approximately two years before becoming aware of the Schering patent. The same testimony indicated that P–C began working with TBS without knowledge that TBS had ever been used in a contact lens. (Tr. 823–836). "Multiplication of damages depends upon the degree of bad faith exhibited by the defendant," *Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 638 F.2d 661, 662–63 (3d Cir.1981), and the fact that P–C developed its lenses independently significantly diminishes the degree of its culpability.

Second, while P–C did not satisfy its affirmative duty to obtain some reasonable basis for believing in the invalidity of the Schering patent before commencing production of its lenses, it has not litigated this case in bad faith. By the time of trial, counsel for P–C, based upon the prior art and the testimony of a highly qualified expert, Mr. Salame, had developed litigable issues with respect to validity and I am confident that P–C and its counsel believed in the merits of its defense at trial.

Finally, while wholly justified given the record before it, I believe the jury's evaluation of damages was on the high side of the permissible range.

### B. *Attorney's Fees*

■ Schering moves for an award of reasonable attorney's fees pursuant to 35 U.S.C. § 285. Such an award is appropriate where, as here, there has been a finding of willful infringement. *E.g., Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.,* 761 F.2d 649 (Fed.Cir.1985);

*Central Soya Co., Inc. v. Geo. A. Hormel & Co.,* 723 F.2d 1573, 1577–78 (Fed.Cir. 1983); *Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540 (Fed.Cir. 1984).

### C. *Prejudgment Interest*

Schering has moved pursuant to 35 U.S.C. § 284 for an award of prejudgment interest.

■ There can be little doubt that Schering is entitled to such an award. The Supreme Court has recently construed 35 U.S.C. § 284 to require that prejudgment interest ordinarily be awarded:

> The standard governing the award of prejudgment interest under § 284 should be consistent with Congress' overriding purpose of affording patent owners complete compensation. In light of that purpose, we conclude that prejudgment interest should ordinarily be awarded. In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement. An award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the foregone use of the money between the time of infringement and the date of the judgment. (footnote omitted)

*General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 655–56, 103 S.Ct. 2058, 2062–63, 76 L.Ed.2d 211 (1983). P–C has not alleged any facts demonstrating that a prejudgment award would be inappropriate in this case.

■ Schering relies upon *Lam, Inc. v. Johns-Manville Corp.,* 718 F.2d 1056, 1066 (Fed.Cir.1983) for the proposition that this Court may adopt for prejudgment interest a rate above the Treasury bill rate set by 28 U.S.C. § 1961 for post-judgment, namely the prime interest rate or the corporate

bond rate. However, the court in that case stated:

> The district court may "fix" the interest and select an award above the statutory rate, or select an award at the prime rate. Once the claimant has *affirmatively demonstrated* that a higher rate should be used, the district court may fix the interest or that higher rate. (citations omitted).

718 F.2d at 1066 (emphasis added). In the present case, Schering offered no evidence which would support an award above the statutory rate. In *Lam, Inc. v. Johns-Manville Corp.*, the claimant "affirmatively demonstrated and the district court found that Lam borrowed money at or above the prime rate in order to continue its operations." *Id.* A comparable showing has not been made by Schering here. Accordingly, an award of prejudgment interest will be made at the Treasury bill rate as set forth in 28 U.S.C. § 1961, compounded annually. I also endorse the method by which Schering has calculated the prejudgment interest which it seeks.

## IV. CONCLUSION

P–C's motion for a JNOV or a new trial will be denied. Schering will promptly submit an amended form of final judgment which will double the damages found by the jury and will include interest from the time each reasonable royalty payment would have been made until the date of judgment. This final judgment will also award counsel fees in an amount to be hereafter agreed upon or fixed by the Court.