**STUDIENGESELLSCHAFT KOHLE m.b.H., Plaintiff,**

v.

**DART INDUSTRIES, INC., and Kraft, Inc., Defendant.**

Civ. A. No. 3952–CMW.

United States District Court, D. Delaware.

Aug. 13, 1987.

Howard M. Handelman, of Bayard, Handelman & Murdoch, Wilmington, Del., Arnold Sprung, and Nathaniel D. Kramer, of Sprung, Horn, Kramer & Woods, New York City, of counsel; for plaintiff.

Arthur G. Connolly, Jr., of Connolly, Bove, Lodge & Hutz, Wilmington, Del., Thomas F. Reedy, Jr., Stanton T. Lawrence, III, and John R. Lane, of Pennie &

Edmonds, New York City, of counsel; for defendant, Dart Industries, Inc.

E. Norman Veasey, and Robert H. Richards, III, of Richards, Layton & Finger, Wilmington, Del., Thomas V. Heyman, Claire Ann Koegler, and Leora Ben-Ami, of Dewey, Ballantine, Bushby, Palmer & Wood, New York City, of counsel; for defendant, Kraft, Inc.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

In July of 1970, litigation began between Studiengesellschaft Kohle mbH ("SGK") and Dart Industries ("Dart") concerning Dart's alleged infringement of United States Patent No. 3,113,115 (" '115") issued to Dr. Karl Ziegler, the predecessor in interest to SGK. This Court held the '115 patent to be valid and infringed. *Studiengesellschaft Kohle mbH v. Dart Industries*, 549 F.Supp. 716 (D.Del.1982), *aff'd*, 726 F.2d 724 (Fed.Cir.1984). Now before the Court, twenty-three years after infringement began and seventeen years after the litigation started, are the objections the parties filed to the Special Master's assessment of damages based upon an accounting trial held before the Master.[1] The Master assessed a total damage award, as of October 31, 1986, of $69,942,450. The compensatory damage award was $18,169,-360. The pre-judgment interest award, which continues to grow, was $42,688,410. The Master also assessed enhanced damages of $9,084,068 and awarded plaintiff attorneys' fees.

This Court's prior opinion provides an explanation of the '115 patent and its relationship to the Dart catalyst. Briefly,

[T]he '115 patent teaches a system for the polymerization of ethylene and other lower olefins, including propylene. The catalyst system consists of alkyl aluminum halides, especially diethyl aluminum chloride, and titanium halides, especially titanium tetrachloride. The interaction of these components produces a catalyst that has proven singularly active, effective and efficient in producing high grade plastic polymers. 549 F.Supp. at 722.

The Court held that the Dart catalyst used for producing polypropylene infringed the '115 patent:

Thus, the Dart catalyst performs essentially the same function, the polymerizaton of propylene, in essentially the same way, catalysis at an active site created by the interaction of trivalent titanium chloride and diethyl aluminum chloride, to achieve substantially the same result, the production of commercially useful, e.g., isotactic, polypropylene. *Id.* at 754.

The Federal Circuit affirmed the Court's determination of validity and infringement and remanded the case to the Court for the accounting phase of the trial. By Order dated March 15, 1985, the Court appointed a Special Master to hold an accounting trial to determine the amount of damages to be awarded SGK; whether pre-judgment interest should be awarded SGK and the rate and periods for which it should be awarded; whether the infringement was willful and therefore increased damages should be awarded; and whether this was an exceptional case for which attorneys' fees should be assessed. The Master issued his Final Report on November 25, 1986. Pursuant to Fed.R.Civ.P. 53(e)(2), the parties filed objections to the Final Report which are the subject of this Opinion.

## I. THE MASTER'S REPORT

The three major issues on review concern the Master's rulings with respect to the

---

1. Because of corporate reorganization, Dart Industries is no longer the sole defendant. Kraft, Inc. is a second defendant to the action and filed separate briefs before this Court. In 1964, Dart was known as the Rexall Drug and Chemical Co. The infringing operation in Odessa, Texas was a joint venture between Rexall and El Paso Products Co. For purposes of simplicity, all references to the infringing company will be to "Dart". Because SGK is the successor in interest to Dr. Ziegler, the Court will use SGK and Ziegler interchangeably.

The Court will also use certain abbreviations: "Rep." denotes the Special Master's Report; "R." denotes the record at trial which was numbered sequentially from the liability trial through the accounting trial; "DX" and "PX" denote defendants' exhibits and plaintiff's exhibits, respectively; and "Tr." denotes the transcript of the oral argument before this Court.

reasonable royalty rate, willful infringement, and pre-judgment interest. The Master's assessment of attorneys' fees is derived from his determination that the infringement was willful. The statutory bases for the Master's damage assessment are 35 U.S.C. §§ 284, 285 (1982).[2]

On the reasonable royalty rate issue, the Master calculated a royalty rate of 4% of total net sales based upon a hypothetical negotiation between the parties in the benchmark environment, the time that infringement began. The Master rejected the probative value of the various existing licenses before undertaking the hypothetical negotiation analysis. The licenses he considered included the following:

1. The Ziegler-SGK Licensing Program of the 1950's ("4-3-2 Licenses"): These licenses provided for running royalties at a decreasing rate of 4%-3%-2% depending upon quantity and required up-front payments that were fully creditable against future royalties. A fully creditable up-front payment is a lump sum payment that is then used to offset money due on the running royalty. The licenses also contained "most favored licensee" provisions that would require SGK to charge the licensee a lower royalty rate if a later licensee were granted a rate lower than the rate being charged under the 4-3-2 license. The 4-3-2 Licenses granted rights to use all of the Ziegler United States Patent Rights and certain technological assistance.

2. Ziegler Pool Licenses ("Pool Licenses"): These licenses, granted jointly by Ziegler and Montecatini, gave licensees rights under both Ziegler and Montecatini patents at the standard sliding scale royalty rate of 5.5%. Montecatini, later known as Montedison, owned patents closely related to Ziegler's. Ziegler was to receive 30% of the royalties received under the Pool Licenses.

3. Standard 1970 Offer: SGK offered a sliding scale royalty of 1.5%, 1.2%, and 1.0% to the industry during the pendency of the Phillips litigation.

4. The settlement of the litigation between Ziegler and Phillips Petroleum Company: After the Fifth Circuit held the '115 patent to be valid and infringed by Phillips, *Ziegler v. Phillips*, 483 F.2d 858 (5th Cir.1973), *cert. denied*, 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973), Phillips settled the damages phase by paying a lump sum amount, which was equivalent to an effective royalty rate of 5% for past infringement, and agreeing to a 1.5% running royalty for the future. The effective rate of this entire settlement, based on Phillips' production, was a royalty of 2.15%.

The Master cited to other agreements in his analysis, but, as with the above, he found that none of the agreements either established or tended to establish a reasonable royalty.

■ Because the Master found that he could not determine a royalty rate from the existing rates alone, he applied the hypothetical negotiation methodology. The Master considered a myriad of factors that would have affected the bargaining positions of both parties had they actually negotiated an agreement. Among the important factors the Master noted were the status of the '115 as a pioneer patent;[3] the lack of a non-infringing alterative; Dart's anticipated profits of 30%; and SGK's status as a non-manufacturing, licensing patentee.

---

2. 35 U.S.C. § 284 reads in relevant part:
 Upon finding for the claimant, the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court....
 35 U.S.C. § 285 provides for attorneys fees to the prevailing party in "exceptional" cases.

3. A pioneer patent, as defined long ago by the Supreme Court, is "a patent concerning a function never before performed, a wholly novel device, or one of such novelty and importance as to make a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what has gone before." *Boyden Power-brake Co. v. Westinghouse*, 170 U.S. 537, 569, 18 S.Ct. 707, 723, 42 L.Ed. 1136 (1898). When a particular patent is determined to be a pioneer patent, the claims in that patent should be read broadly.

On the willfulness issue, the Master found that Dart should have received an opinion from outside counsel prior to commencing the infringement, that in-house counsel's opinions did not satisfy Dart's duty of due care, and that post-infringement activities as a matter of fact, not law, did not change the willfulness finding. The Master found that pre-judgment interest at the prime rate compounded quarterly with accrual to commence on the day following the end of each quarter of infringement would fairly compensate SGK for the lost use of the royalty payment money.

## II. SCOPE OF REVIEW

The Court reviews the Master's report pursuant to the procedure established in Fed.R.Civ.P. 53. After a hearing, the Court "may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions." Fed.R.Civ.P. 53(e)(2). The Master's Report is only advisory; it is the Court that must render judgment. "The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court." Fed.R.Civ.P. 52(a). Ultimately, "[i]t is the district court that makes an adjudication upon the facts and law and enters judgment." 5A Moore's Federal Practice ¶ 53.-12[8] (1986). This Opinion represents the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52.

■ Despite the fact that the Court must enter the judgment, the Court's freedom to alter the Master's determination is limited because the Master's findings of fact must be adopted unless they are clearly erroneous. Fed.R.Civ.P. 53(e)(2). This standard is similar to the standard circuit courts of appeals apply to district court findings of fact. 5A Moore's Federal Practice ¶ 53.12[4]. Similarly, conclusions of law have "no effect except to the extent

that they are correct propositions of law." *Id.* at ¶ 53.12[6].

■ The Supreme Court's most recent statement on the meaning of the clearly erroneous standard is found in *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).[4] "If the district court's [Master's] account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals [the district court] may not revise it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 573–574, 105 S.Ct. at 1512. However, even if there is some evidence to support the Master's view, the district court may judge a finding to be clearly erroneous when "on the entire evidence [the court] is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Deference to the factfinder's conclusions is greatest with respect to credibility determinations, but the factfinder "may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness." *Anderson*, 470 U.S. at 575, 105 S.Ct. at 1512. This last factor is critical in a case such as this one where the Master relied extensively on expert testimony. Simply because the Master "credited" the expert, his findings should not be insulated from review if the expert's testimony was based upon erroneous factual or legal assumptions.

## III. REASONABLE ROYALTY RATE

The Master assessed compensatory damages against Dart based upon his finding that a reasonable royalty rate for Dart's infringement would be 4% of net sales of $454,234,000.00 [5], or $18,169,360.00. Dart

---

**4.** *Anderson* involves review of the district court's findings pursuant to Fed.R.Civ.P. 52(a). However, the standard for review of Rule 53(e)(2) is identical. *See TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 900 (Fed.Cir.1986) (citing *Anderson* in describing scope of review of special master's findings).

**5.** The Master's ruling that the royalty rate should be applied to this figure was not contested in this review.

argues that this finding is clearly erroneous, and that the reasonable royalty rate should be 1.5%. SGK also claims that the Master's damage assessment is clearly erroneous, but SGK contends that the royalty rate should be greater than that imposed by the Master, 5% instead of 4%.

■ The Master applied the hypothetical negotiation method approved by the Federal Circuit for determining a reasonable royalty. *See, e.g., TWM Mfg. v. Dura Corp.,* 789 F.2d 895 (Fed.Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986). No particular method of calculation is required of the trial court. The trial court's choice is discretionary, but the result must be one that fairly compensates the patentee and cannot be less than a reasonable royalty. *King Instrument Co. v. Otari Co.,* 767 F.2d 853 (Fed.Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986); 35 U.S.C. § 284.

■ Dart's first contention on review is that the Master erred as a matter of law because he relied on the hypothetical negotiation method for finding a reasonable royalty rate instead of relying upon SGK's licensing conduct. Dart is not contending that the other licenses establish a royalty rate.[6] Dart contends, however, that the Master should rely upon these various license agreements to determine a reasonable royalty and should not have created a hypothetical negotiation to determine the reasonable royalty.

■ Dart's argument is an attempt to make a distinction between finding a reasonable royalty rate by looking at existing licenses and finding a reasonable royalty rate based upon hypothetical negotiations. Such a neat distinction cannot be made. In *Georgia-Pacific v. U.S. Plywood,* 318

F.Supp. 1116, 1120 (S.D.N.Y.1970), *modified and aff'd.,* 446 F.2d 295 (2d Cir.1971), *cert. denied,* 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971), the Court listed fifteen factual considerations a court should apply in determining a reasonable rate. The fifteenth consideration is a statement of the hypothetically negotiated "willing buyer—willing seller" approach to calculating a reasonable royalty rate:

> The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license. *Id.*

This method requires the Court to hypothesize as to what rate the patentee and infringer would have arrived at had they actually negotiated a license.

■ Despite the fact that this hypothetical negotiation factor is just one of the factors on the list, the hypothetical negotiation is a method for incorporating the other factors in order to arrive at a reasonable royalty rate.

> What a willing licensor and a willing licensee would have agreed upon in a suppositious negotiation for a reasonable royalty would entail consideration of the specific factors previously mentioned [the list of fifteen items], to the extent of their relevance. Where a willing licensor

6. An established royalty rate is used in a case in which prior negotiated royalties to the time of infringement are paid by sufficient persons to indicate the reasonableness of the rate, are uniform, are not paid under threat of litigation, and are for comparable rights under the patent. *See, e.g., Rude v. Westcott,* 130 U.S. 152, 165, 9 S.Ct. 463, 468, 32 L.Ed. 888 (1889); *Faulkner v. Gibbs,* 199 F.2d 635, 638 (9th Cir.1952). In the instant case, the Master has elaborated on many reasons why none of the existing licenses estab-

lish a royalty for the '115 patent. These reasons include the remoteness in time of the 1950's licenses; that the patent had not yet issued when these agreements were signed; the inability to determine from the Pool Licenses what amount SGK would have accepted outside the pool; and the fact that post-infringement actions cannot establish a royalty. Using these factors to hold that there was not an established royalty is not clearly erroneous.

and a willing licensee are negotiating for a royalty, the hypothetical negotiations would not occur in a vacuum of pure logic. *Id.* at 1121.

The lesson that *Georgia-Pacific* and later case law teaches is that the necessarily speculative hypothetical negotiation is rendered less speculative by use of as many facts as can be gleaned from the evidence to create a reasonable royalty. Even if none of these factors alone can establish a reasonable rate, the various factors when considered together can do so. Yet it is also true that not every factor in the *Georgia-Pacific* list is relevant to every case. It is the factfinder's role to determine the probativeness of each of these factors.

A. *Existing Royalties: The Licensing Agreements*

The first factor on the *Georgia-Pacific* list concerns existing royalties:

> The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty. 318 F.Supp. at 1120.

The Third Circuit viewed this factor as being of primary importance in *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 612 F.2d 1353, 1358 (3d Cir.1980), *cert. denied*, 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 30 (1980). The court found that the district court needed to find facts to justify determining a reasonable royalty rate that deviated from an existing royalty rate. As the factor is written in *Georgia-Pacific* and as it was applied in *Trio Process*, however, the existing royalty must prove or tend to prove an established royalty. In *Trio Process*, the court applied the past licensing conduct of the parties in suit and found that figure to be highly probative of the amount that should have been charged for the infringement. *Trio Process*, 612 F.2d at 1353.

In the instant case, the Master examined the existing licenses and determined that they did not prove or tend to prove a royalty rate. The careful consideration the Master gave to the existing royalties is indicated by the attention he devoted to them in his report. The Master ultimately determined that, "[t]he license agreements, the standard offer of 1970, and the *Phillips'* settlement do not individually or collectively establish a rate or tend to prove a reasonable rate." Rep. at 13. The Master then found that the royalties were of minimal value to his hypothetical negotiation. "For reasons which have been detailed in the discussion on existing royalties, relatively little weight is afforded to the royalty rates in licenses considered there except insofar as the most favored licensee provisions would persuade SGK to negotiate at a rate less than contained therein." *Id.* The Master thus made a finding of fact that the various license agreements were of minimal value in determining the reasonable royalty. This Court's role is then to determine if that finding was clearly erroneous.

Dart contests the Master's findings with respect to the 1950's licenses because those licenses included rights to all of Ziegler's United States Patent Rights and technological know-how. Because these licenses gave licensees more of value than simply rights to use the '115, Dart argues, a license for the '115 alone should not cost more than the 1950's licenses. However, the Master found that, "[a]t the time of [the 1950's] agreement, the polypropylene industry was in its infancy, that the licenses are remote in time to issuance of the '115, and because of the growth of the industry the remoteness makes the agreements even less significant." Rep. at 7. The defendant attempts to refute the remoteness finding on grounds that the 1950's licenses were still in existence in 1964, but what matters is the value placed on the patent at the time the licenses were signed. Their continued existence during the benchmark environment, the time period when infringement began, does not alter the fact that they were signed at a much earlier time in the development of the industry. The Master found other facts, distinct from those relied upon by Dart, that justify his finding. Whether another factfinding court could have weighed these various factors differently does not render the Master's finding clearly erroneous.

Similarly, the Master's finding that the Pool License did not tend to prove a royalty rate is not clearly erroneous, because as the Master stated, there was no evidence to indicate what SGK would accept when negotiating outside of its pooling arrangement with Montecatini. Moreover, the Master applied the Pool License to the extent that he found them relevant: setting a 5.5% ceiling on royalties and informing Dart that anything above 1.65% would give SGK more than they would receive in a Pool License.

The Master's conclusions surrounding post-infringement agreements were not clearly erroneous, because his factual finding that these agreements were tainted by ongoing infringement and litigation is supported in the case law and in the record. The Master properly found that the 1970 Standard offer, given during the pendency of the *Phillips* District Court litigation was severely tainted by that litigation. *See Deere & Co. v. International Harvester Co.*, 710 F.2d 1551, 1557 (Fed.Cir.1983). Ziegler was in a relatively weak bargaining position at the time.

■■■ The same is not true, however, for the settlement Ziegler reached with Phillips itself. The settlement in *Phillips* transpired after the Fifth Circuit had reversed the District Court's finding of no infringement. At the time of the *Phillips* negotiations, then, Ziegler had the same strength that is ascribed to him in a hypothetical negotiation—an unquestionably valid patent. Ziegler and Phillips agreed to a lump sum settlement of 5 million and a future running royalty of 1.5%. Taken together, as the Master properly held they should be, the effective rate of the *Phillips* agreement was 2.15%.

Contrary to the Master's assertion, this settlement is highly probative evidence. The facts here are indistinguishable from those in *Devex Corp. v. G.M. Corp.*, 494 F.Supp. 1369 (D.Del.1980), *aff'd.*, 667 F.2d 347 (3d Cir.1981), *aff'd.*, 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983), where this Court held that the amount Devex offered the industry after a court held its patent valid was highly probative of a rea-

sonable royalty. As in *Devex, Phillips* involved a licensing patentee who had a post-infringement determination of his patent's validity and proceeded to agree to a rate of compensation for the patent. This brand of post-infringement evidence is distinct from other post-infringement evidence because both Phillips and Ziegler knew that the next step in the process was the exact type of accounting exercise that is being undertaken in this case.

The Master ruled: "The *Phillips* eventual settlement is so affected by the litigation that the settlement agreed upon by the parties, *while relevant to this litigation*, does not conclusively establish a reasonable royalty or tend to prove the same." (Rep. at 12) (emphasis added). In the hypothetical negotiation section, despite his finding of relevance, the Master never mentioned the *Phillips'* settlement.

■■■ The *Phillips'* settlement alone does not establish a reasonable royalty, however. First, SGK received the monetary benefit of settling the case rather than enduring the time and expense of a damages trial. In arriving at a lump sum for past infringement, both Phillips and SGK had to be aware of the potential for prejudgment interest as a part of the recovery. Also, market conditions in 1974 affected the amount that Phillips would pay in the future. The Master's determination that the proper approach for evaluating the *Phillips* settlement is to combine the lump sum damage award with the future running royalty is a logical approach to compensate for the factors that made viewing either part of the settlement in isolation unrealistic. Yet, after finding the settlement to be relevant, the Master failed to consider it in the hypothetical negotiation. Merely because the settlement does not, standing alone, establish a reasonable royalty does not mean that it should be ignored altogether when applying the hypothetical negotiation approach.

■■■ Plaintiffs also argue, with respect to the *Phillips* settlement and other Dart arguments, that Dart is precluded from raising arguments on review that were not raised below. SGK primarily relies upon

*CPG Products v. Pegasus Luggage*, 776 F.2d 1007 (Fed.Cir.1985). In *Pegasus*, the Federal Circuit refused to reconsider the damage assessment when the defendant failed to present any evidence on damages, and affirmed the district court's denial of a motion for relief from the judgment based upon an issue not raised at trial. The instant case is not as clear. First, evidence with respect to the *Phillips* litigation is in the record. Second, although Dart did not pursue any argument that a combination of the lump sum and running royalty award in *Phillips* should be considered, Dart pursued an argument that the future running royalty was relevant. At the same time, SGK pursued an argument that only the lump sum payment for past infringement was relevant. The Master considered both these arguments and arrived at a compromise position. The Court does not believe that Dart's failure to pursue the exact position that the Master eventually accepted justifies ignoring the settlement on review, because Dart made an argument based on the settlement below that advocated a more extreme position than the one accepted.

SGK also cites *In re Hounsfield,* 699 F.2d 1320 (Fed.Cir.1983) and *Radio Steel Mfg. v. MTD Products, Inc.,* 788 F.2d 1554 (Fed.Cir.1986) as support for its argument. Neither case is applicable here. In *Hounsfield,* the Federal Circuit refused to allow an attorney on appeal to defend a decision of the Patent and Trademark Office Board of Appeals on grounds not relied upon in the Board of Appeals ruling, because "[w]e review the Board's decision on the basis of what the Board said, not on the basis of counsel's theory concerning what the Board really meant." 699 F.2d at 1324. *Hounsfield* concerns procedures for review of administrative action, not issues raised at trial between two private litigants. *Radio Steel* is not applicable because it held that a willfulness finding could not be based upon an underlying infringement that was never adjudged to have occurred. 788 F.2d at 1559. In the liability half of *Radio Steel,* the ruling on the relevant infringement was not raised on appeal. Again, *Radio Steel* is an example where the failure to raise the claim is more clear than in the instant case. The Court has before it the relevant evidence, the various arguments raised below and the Master's report such that the Court finds that it can consider the *Phillips* settlement.

## B. *The Hypothetical Negotiation*

Within the context of the hypothetical negotiation, the Master considered a wide range of facts including Dart's anticipated profits, the absence of a non-infringing alternative and SGK's status as a non-manufacturing licensee. The prior licenses were only considered in establishing a 3.7%–4% floor rate, and a 5.5% ceiling rate. The Master rejected the testimony of defendant's expert, Mr. Goldscheider and credited that of plaintiff's expert, Professor Bischel.

The Master's determination that the floor rate should be between 3.7% and 4% constitutes a clear factual and legal error that renders the Master's result based upon the hypothetical negotiation clearly erroneous. The Master's basis for establishing a floor to the negotiations was the most favored licensee clauses in the 4–3–2 Licenses. That a floor existed is not a clearly erroneous determination, but the floor rate the Master used was erroneously calculated. The Master found that the effective rate of the 4–3–2 Licenses would be approximately 2.1 or 2.2% without consideration of the down payments made by the licensees. The Master then found that, because of the up-front payments made under the 4–3–2 Licenses, the floor had to be adjusted upward to between 3.7 and 4%. Rep. at 22. The Master committed a clear error of fact because there was no empirical reason justifying the drastic increase in the floor rate. He also committed an error of law by failing to consider the licensing approach SGK used in the agreements that were the basis for establishing a floor rate.

There are two possible factual reasons for the Master's decision to use the up-front payments as justification for raising the floor to the 3.7%–4% range, and either rationale is clear error. The Master stated that in order to reach an appropriate hypothetical rate, "the up-front or down payments would have to be added into the

royalty rate." Rep. at 22. Yet, the up-front payments were fully creditable against the royalties due in the future. There was, therefore, no reason to add anything to the effective rate to insure against invocation of the most favored licensee clause. If this were the Master's approach, it was clear error.

The other possible justification for the floor rate the Master used is more clearly found in the testimony that the Master used to support his position than in his opinion itself. The Master based his opinion on the testimony of Professor Bischel. R. 6150–6151. Bischel's testimony was that there was an economic value to SGK and an economic cost to the licensees in the up-front payments. Bischel did not mean that the up-front payments altered the effective rate of the licenses. Instead, Bischel meant that in order to eliminate the economic distinction between a running royalty and a running royalty with an early down payment, the hypothetical rate had to be adjusted upward.

The Court finds the Master's adoption of Bischel's approach to be clearly erroneous. Although Bischel's premise that there is an economic value to the up-front payments is sound, he failed to provide any empirical justification for the drastic increase in the running royalty he claimed was necessary to avoid invocation of the most favored licensee clauses. There is no discussion of, for example, a time value for the up-front money, or of how the economic risk factors in paying money up front can be translated into a percentage rate. The expert does not explain how a holder of a 4–3–2 License would determine what running royalty rate without a down payment would be equivalent to the 4–3–2 rate including a down payment. Such an empirical determination is vital to the conclusion. Although it is true that the Master credited Bischel's testimony, Bischel's conclusion on this issue is wholly speculative and devoid of any factual support or reasoning.[7]

Both the Master and the expert failed to provide an explanation for not imposing a fully creditable, up-front payment to Dart instead of undertaking speculation as to the economic value of the up-front payment. In *Stickle v. Heublein*, 716 F.2d 1550, 1561–1563 (Fed.Cir.1983), the Court found it to be error for the Court to fail to consider the usual licensing approach in assessing the royalty. In *Stickle*, the practice in the relevant industry was to charge a lump sum royalty; yet, the trial court applied a running royalty. The Federal Circuit found this to be error. *Id.* at 1563. Both the Master and the expert failed to apply this rule of law and neither explained a reason for choosing to create a speculative running royalty rate as the floor. The only justification that Bischel offered on cross-examination was that as a "matter of logic", he did not understand how up-front payment could retroactively be applied. R. 6481. Given the awarding of pre-judgment interest, especially at the prime rate compounded quarterly, *see* discussion *infra*, the patentee receives a significant benefit in a judgment deeming there to have been an up-front payment. *See also Orthman Mfg., Inc. v. Chromalloy American Corp.*, 512 F.Supp. 1284 (C.D.Ill.1981) (using the

---

**7.** Bischel's testimony on calculating the floor rate was sparse:

Therefore, as a floor, I don't believe this licensor would have negotiated a royalty agreement with anyone which was less than 4, 3, 2, plus the equivalent, the equivalent of the up-front payment, since in a hypothetical negotiation we cannot have an up-front payment. In this particular case it has to be adjusted in some way by adjusting the royalty rate.

We look at an effective rate of 2.1 or 2.2 percent per year on all production. In my opinion, we would have to add a percent and a half to 2 percent to that royalty rate to adjust for the fact that this licensee was not going to have to make a substantial up-front payment.

I should point out in at least one license agreement, I believe it was the Exxon agreement which was negotiated, one of the later agreements negotiated in the 1950's, the down payment was in the range of approximately a million dollars.

So in order to compensate for that, it would seem to me that this licensor could not have negotiated a royalty of less than about a 3.7 to 4–percent rate. So that would be the minimum rate.

R. 6151. No empirical support was given for his opinion on this point.

685

lump sum and running royalty paid by another licensee in assessing damages). Even though this Court affirms the Master's determination that the 4–3–2 Licenses do not establish a royalty rate, the licensing practice in these agreements is highly relevant in determining the floor royalty rate because it is these licenses that the Master used to justify imposing a floor rate. The Master's failure to justify creating a different kind of royalty than existed in the 4–3–2 Licenses is an error of law.

■ The errors in calculating the floor rate and in understanding the *Phillips* settlement's significance renders the Master's determination that 4% is a reasonable royalty clearly erroneous. The Master's determination of the floor erroneously limited the range of royalties he could consider. This is especially significant given that the royalty selected is within the range of the floor rate as found by the Master. If the lower most boundary had been properly determined, the Court finds that the Master would have awarded royalties at a lower rate. Second, his grounds for ignoring the *Phillips* settlement did not in fact apply to that settlement. The *Phillips* settlement thus stands as an existing royalty that should have been considered in the hypothetical negotiation. *Georgia-Pacific*, 318 F.Supp. at 1120.

### C. *The Court's Reasonable Royalty Rate*

Having determined that the Master's conclusion of a 4% royalty rate was clearly erroneous, this Court will determine a reasonable royalty rate. Under Fed.R.Civ.P. 53(e)(2), "The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit with instructions." *See United States v. 1,516.90 Acres, Stewart County, Tenn.*, 405 F.2d 913 (6th Cir.1968), *cert. denied*, 395 U.S. 909, 89 S.Ct. 1752, 23 L.Ed.2d 222 (1969) (affirming trial court's power to make findings as to damages after finding report clearly erroneous); *United States v. Hilliard*, 412 F.2d 174 (8th Cir.1969) (affirming trial court's power to modify damage

award). *Cf. Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 612 F.2d at 1361 (determining damages at the appellate level based on facts in record rather than remanding case back to district court).

In doing so, this Court is cognizant of its role as a reviewing court. Those factual findings which the Court has not described above are not clearly erroneous. For example, the Court accepts the Master's findings that Mr. Goldscheider's testimony should be rejected; that SGK would not accept less and Dart would not pay more than would result from the Pool License; that Dart had just completed construction of a ten million dollar polypropylene plant; that there were no non-infringing alternatives; and that SGK was not a manufacturing patentee. Moreover, the hypothetical negotiation methodology the Master used will be accepted as the starting point for the Court's determination.

The Court's methodology in adjusting the Master's conclusion so that a proper reasonable royalty is reached will be to modify the rate the Master found based upon the two clear errors the Court found: the reliance on a 3.7–4% floor rate, and the failure to distinguish the *Phillips* settlement from the other litigation-based settlements.

■ With respect to Professor Bischel's finding on the effective rate needed to compensate for the up-front payments, the Court accepts that there is a need to adjust for the up-front payments but finds that the most straight forward manner for doing so would be to assess an up-front payment on the Dart royalty. Rather than attempting to guess at an economic value, the award should be grounded in the reality of SGK's licensing practices. *Stickle.* This up-front payment cannot be less than that paid by the most favored licensee who made the greatest up-front payment. Union Carbide's total up-front payment, as testified to by Dr. Martin, was 1.18 million dollars. Tr. 6624. Though this up-front payment was divided between two license agreements, only one of which covered polypropylene, the Court finds that the total up-front payment made by Union Carbide should be applied to Dart. This is done to

reflect the Master's determination that none of the agreements alone established a royalty rate. None of the 4–3–2 License solely are aimed specifically at the '115 patent for the production of polypropylene such that a distinction should not be made between the two Union Carbide agreements. In order to avoid the risk of invocation of any most favored licensee clause, the Court finds that an up-front payment of $1.18 million fully creditable against future royalties should be assessed against Dart. Under the Union Carbide agreement, the up-front payments would be creditable to the extent of 50% of each royalty payment due after the patent issued in the "Territory", which included the United States. PX1212 at 8. Because Dart's use of the '115 took place after the '115's issuance, the up-front payment will be credited to the extent of 50% of each royalty payment due.[8]

■ The next step is to determine the running royalty rate. As the Master correctly found, the most favored licensee clauses will impose a floor rate; however, because the Court accounts for the up-front payments in the way described above, the floor rate is the 2.1–2.2% found by the Master when the up-front payments were not considered. Rep. at 22. The Master's finding that a ceiling rate of 5.5% based on the Pool Licenses is also accepted. Last, as the Master properly held, the *Phillips* settlement is "relevant to this litigation", and the settlement should be considered as a whole, not in its parts.[9] The total payment by Phillips, including the lump sum settlement and the future royalty resulted in an effective rate of 2.15% for Phillips, or 1.85% when based on Dart's production. Unlike the Master's approach, then, the Court has found one royalty agreement

worthy of serious consideration. Nevertheless, because SGK received an economic benefit in settling the *Phillips* case rather than enduring an accounting trial, Dart should pay a higher effective royalty than Phillips paid.

■ The Master's ultimate determination started with Bischel's finding that 5% was a reasonable royalty. The Master then reduced this award based upon "factors related within this opinion including consideration of the improvement of the '115 by the Stauffer process, the threat to the SGK position because of the pool package, the fact that SGK is not a producer but a licensor, and the average of royalty rates in the chemical industry." Rep. at 23. The Court finds that his error as to the floor rate, which was at least 1.5%, should be applied to lower the royalty rate by 1.5% to a reasonable royalty of 2.5%. This conclusion is buttressed by the fact that the royalty rate would then be .35% more than the *Phillips'* settlement, thus taking into consideration the only existing royalty which this Court finds should have been considered. Although an effective rate of 2.5% is higher than the rate any other licensee paid, the fact remains that Dart did not actually purchase a license and that an infringer should pay at least a reasonable royalty. 35 U.S.C. § 284.

## IV. WILLFULNESS—ENHANCED DAMAGES

The Master found that Dart's infringement of the '115 patent was willful. Rep. at 23–41. Accordingly, he awarded enhanced damages equal to 50% of the compensatory damage award.[10] This finding was clearly erroneous. First, the Master

---

**8.** For example, assume Dart owed $600,000 in royalty payments in the first year of the license. Dart would then pay SGK $300,000, and $300,000 would be taken from the up-front payment. Dart would then have a balance of $880,000 to be applied in the future years at the 50% rate until exhausted.

**9.** Again, though the Master found the *Phillips* settlement relevant, he did not consider it when undertaking the hypothetical negotiation analysis.

**10.** Pursuant to 35 U.S.C. § 284, "the court may increase the damages up to three times the amount found or assessed." The Master limited his award to an additional 50%, or $9,084,680, because the size of the compensatory award meant that the enhanced damages were sufficiently large when applied at the 50% rate. Rep. at 41.

made some clearly erroneous factual findings which he then relied upon. More importantly, the Master erred because he failed to consider all the evidence relevant to the willfulness issue and imposed particular legal requirements on Dart, thus misapplying the "totality of the circumstances" test. *See, Central Soya v. Geo. A. Hormel Co.,* 723 F.2d 1573 (Fed.Cir.1983); *Underwater Devices v. Morrison-Knudsen Co.,* 717 F.2d 1380 (Fed.Cir.1983).

### A. *The Totality of the Circumstances Test*

In determining whether or not patent infringement is willful, the Federal Circuit has established a totality of the circumstances test. "It is necessary to look at 'the totality of the circumstances presented in the case', *Underwater Devices,* 717 F.2d at 1390 (Fed.Cir.1983), in determining whether a reasonable person would prudently conduct himself with any confidence that the courts might hold the patent invalid [or not infringed]." *Central Soya Co.,* 723 F.2d at 1577. The standard means that, though there are factors which are generally applicable to all cases, the significance of each factor depends upon the particular case.

 The "totality of the circumstances" test also means that there are no *per se* factors which result in a definitive finding of willfulness or non-willfulness. In *Radio Steel & Mfg. Co. v. MTD Products, Inc.,* 788 F.2d 1554, 1559 (Fed.Cir. 1986), for example, the Federal Circuit held that a patent counsel's opinion on validity and infringement need not satisfy "particular requirements." The opinion simply must, in the context of the particular case, justify a good faith belief that the patent was not infringed. *Id.* Directly relevant to the instant case is the discussion in *Underwater Devices,* 717 F.2d at 1390. The Federal Circuit noted that the fact that in-house counsel, not outside counsel, prepared the validity opinion was one "factor to be weighed" but was not dispositive. That the attorney on whose opinion the defendant relied was not a patent attorney

would not definitively require a willfulness finding. Though the court upheld the willfulness finding in *Underwater Devices,* the court posed hypothetical circumstances in which reliance upon in-house, non-patent counsel would not justify a willfulness finding. *Id.* Similarly, in the instant case, Dart's decision to use inside counsel and that counsel's opinion should not in and of itself result in a willfulness finding. The circumstances surrounding that decision must be considered.

The ultimate teaching of the Federal Circuit's cases, then, is that the willfulness determination is highly fact-based, and failure to consider the totality of circumstances or the imposition of *per se* requirements is an error of law. *See also, State Industries v. A.O. Smith Corp.,* 751 F.2d 1226 (Fed.Cir.1985); *Bott v. Four Star Corp.,* 807 F.2d 1567 (Fed.Cir.1986); *American Original Corp. v. Jenkins Food Corp.,* 774 F.2d 459 (Fed.Cir.1985). Although a finding of willfulness is a finding of fact to be judged under the clearly erroneous standard, *Bott,* 807 F.2d at 1572, a failure to consider the totality of circumstances in making this finding is an error of law.

### B. *The Master's Report*

The Master's willfulness finding was based on several key factors. First, the Master properly found that Dart was under an affirmative duty of due care to determine whether or not it was infringing before starting production of polypropylene because it had actual notice of the '115 patent prior to opening its polypropylene plant. *Underwater Devices,* 717 F.2d at 1389. The Master then found that Dart improperly relied upon the opinion of one of its inside counsel, Mr. Valles.[11] This determination was based upon the Master's finding that using inside counsel deviated from Dart's usual policy, did not conform to the requirements of the law, and that Valles "did not possess special knowledge in this area that put him in a superior position to qualified patent counsel." Rep. at 25–29. The Master also ruled that the Valles' opinions did not satisfy Dart's duty

---

11. Mr. Valles was Assistant Patent Counsel at Dart.

of due care. Rep. at 29–37. Last, after ruling that post-infringement activities are also relevant, the Master ruled that these post-infringement opinions of outside counsel did not satisfy Dart's duty.[12]

### 1. *The Opinion of Inside Counsel*

The Master committed a basic error of law when he stated: "Dart appears to have followed the policy of getting an [outside] [13] opinion when it feared the patent holder would enforce its rights or it was going to be sued for failure to take a license. This 'policy' does not conform to the requirements of the law. (*Radio Steel* and *Underwater Devices, supra* )." As the above discussion illustrates, *Radio Steel* and *Underwater Devices* make it clear that there are no particular requirements in a totality of the circumstances determination. Creating such a requirement is an error of law.

■■ The Master also committed clear factual error in finding that Dart's decision to use an opinion from inside counsel in 1964 was unjustified, because he failed to consider all the facts that entered into that determination. At the core of the Master's determination was that he found Dart's decision to use in-house counsel inexplicable in light of the decision to use outside counsel for the Montecatini patent in 1964 and the decision to seek an opinion from outside counsel on the '115 patent in 1967. The Master failed to consider the fact that Montecatini informed the industry that it would enforce its patent and that it believed the entire industry needed to buy a license in order to operate, R. 10,763; DX762 at 500; thus, Dart sought outside counsel for an opinion with respect to the Montecatini patent. R. 6872; 9221. By contrast, Dart told Ziegler, through Ziegler's agent Montecatini, that it did not believe it needed a license. DX758 at 49–52; DX714 at 13,032. Neither Ziegler nor Montecatini contested that assertion in

1964. The difference in Dart's approach to the two patents is justified by the difference in approach taken by the patentees. *See American Original*, 774 F.2d at 465.

Moreover, the decision to get an outside opinion from Dean Laurence in 1967 was a result of Ziegler's decision to sue Phillips on a patent related to the '115. Only at that time could it be said that the circumstances of the Montecatini patent and the Ziegler patent were sufficiently alike to justify a similar approach to both patents by Dart. In short, the Master failed to consider a key fact, the patentee's response to Dart's assertions, in doubting the propriety of Dart's reliance on Valles' opinion.

The Master also considered Mr. Valles' qualifications on an improper standard. The only mention of Valles' qualifications is in stating that "he did not possess special knowledge in this area that put him in a superior position to qualified patent counsel in this field." Rep. at 28. That finding requires too much of Dart. Valles need not be in a "superior position" to qualified counsel; the question is whether Valles was qualified to render an opinion. The Master only viewed Valles' qualifications as they could be used as a justification for deviating from the Master's requirement that Dart get outside counsel. Rep. at 28. To justify such a deviation, the Master believed that Valles' qualifications had to be superior to that of outside counsel. The Master failed to consider whether, Valles' knowledge relative to outside counsel notwithstanding, Valles was sufficiently qualified to render an opinion on the '115 patent.

■■ Before his employment at Dart, Valles received a Bachelor of Science degree from George Washington University and a law degree at Georgetown University; he worked at Gulf Oil performing technical studies in polymerization and polyolefins, and he was assistant patent counsel at Glidden Company. R. 8169–8188. Dart hired Valles to work in the polyolefin area.

---

**12.** The Master first held that Dean Laurence did not issue an oral opinion on the '115 patent and then discounted the value of the two Pennie & Edmonds opinions.

**13.** The Master did not include the word "outside" in the quoted sentence but the context of the sentence indicates that he meant that Dart only sought an opinion of outside counsel in certain, limited circumstances.

R. 8187–88. The evidence indicates that from 1960–1963, Valles monitored developments in the chemical field on issues that would be relevant to his opinions on the '115 patent. PX1010, 1011; R. 8214–15; DX758 at 15–16. Despite these factors, the Master only viewed Valles' qualifications as they compared to outside counsel. The Master's determination that Valles' qualifications were not superior to those of outside counsel is not clearly erroneous, but he erred in not considering whether Valles was qualified to render an opinion without comparison to outside counsel. Again, the Master imposed a requirement that Dart use outside counsel unless Dart could prove why outside counsel was not required in this case. The Court finds that Dart acted reasonably in electing to rely on the opinion of a qualified patent attorney who had been monitoring the relevant field for three years prior to the issuance of the '115.

Several other factors confirm the reasonableness of Dart's actions. First, the reason Dart had notice of the Ziegler patent prior to infringement was because of Valles' monitoring of patents in the polymer field. In fact, Valles learned of the '115 patent only two days after it issued. Although Dart's pre-infringement knowledge creates Dart's affirmative duty, that Dart learned of the patent through its own diligence is a relevant factor in the totality of circumstances. Contrary to other cases, the infringer was not notified by the patentee. *See, e.g., Underwater Devices,* 789 F.2d at 1384; *Kloster Speedsteel AB v. Crucible, Inc.,* 793 F.2d 1565, 1580 (Fed.Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987). Second, that Valles learned of the patent himself and proceeded to study it indicates that he was doing his job and that neither he nor Dart was ignoring the relevant patents in the field.

Moreover, Dart's in-house counsel exercised the independence to recommend that the company license some patents. DX717; DX758 at 9, 15. The Master failed to note that Dart relied on in-house counsel in making licensing decisions, and that in-house counsel viewed part of its job as determining when Dart did or did not need a license. One of Mr. Whipple's memoranda indicates that Dart was taking a realistic approach to licensing, and there is no evidence to indicate that Valles was under any pressure to recommend in favor or against licensing any particular patent.[14] *See Radio Steel,* 788 F.2d at 1559 (noting that counsel was not subjected to any coercion in rendering the opinion).

In short, the Master made two major errors in finding that relying on Valles to render the opinion was unjustified. First, he failed to consider the distinction between Ziegler's and Montecatini's actions that justified the different approaches to the patents Dart took. *American Original.* Second, he failed to discuss the many factors that justified Dart's use of in-house counsel in this case. Though the Master is correct that use of in-house counsel is a factor to be weighed, he is incorrect when he approaches the factor with the view that use of in-house counsel is inherently wrong. *Western Electric Co. v. Stewart-Warner Corp.,* 631 F.2d 333, 337 (4th Cir. 1980), *cert. denied,* 450 U.S. 971, 101 S.Ct. 1492, 67 L.Ed.2d 622 (1981) ("Just because an attorney is in-house counsel does not mean that his opinions are necessarily suspect."). Just as the overall determination of willfulness is dependent on the totality of the circumstances, so too should the infringer's decision to use a particular counsel be viewed on a case by case basis.

That the in-house counsel factor was paramount in the Master's determination is evident in that two of his four major reasons for his willfulness finding related to Dart's choice of attorney: "the pre-infringement opinions relied upon by Dart were provided by in-house counsel ... and

---

14. DX729, written before the Ziegler patent issued, indicates that Dart was considering which patents it needed to license for its polypropylene operation. This document also demonstrates that Dart was aware that Ziegler could potentially have a strong position in this field. Ultimately, Dart determined that Ziegler's patent did not affect Dart's operation. Mr. Whipple was the chief inside patent counsel for Dart.

Dart deviated from its usual practice of getting opinions from competent counsel not employed by it." Rep. at 37. The Master's great reliance on this factor was erroneous; indeed, there is substantial evidence to justify Dart's decision to use Valles.

### 2. *Valles' Opinions*

■■■ The next section of the Master's opinion concerns the substance of the two Valles opinions. Regardless of which counsel Dart chose, the opinion on which they relied must be one that supported a good faith belief that they were not infringing the patent. *Bott*, 807 F.2d at 1572. Some of the factors to be considered in evaluating an opinion are whether it is competent, authoritative, and contains sufficient internal indicia of reliability to justify the infringer's belief that the opinion is competent. *Radio Steel*, 788 F.2d at 1559. An opinion containing mere bald, conclusory statements of non-infringement will not satisfy the duty of due care. *Underwater Devices*, 717 F.2d at 1390; *Kori Corporation v. Wilco Marsh Buggies & Draglines*, 761 F.2d 649 (Fed.Cir.1985), *cert. denied*, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985).

The Master's determination that the Valles' opinions were improperly relied upon by Dart,[15] is primarily based upon two factors. First, the Master found certain language in the Valles opinion and in subsequent letters to be equivocal. Rep. at 32. Second, and in more detail, the Master relied upon the plaintiff's expert's testimony as to why the various grounds set out in the Valles' opinions did not justify his ultimate finding that Dart would not infringe the patent.

The two Valles' opinion letters were dated December 5, 1963 and January 8, 1964. DX730A; DX732A. The December 5th letter, rendered two days subsequent to the '115 patent's issuance is a preliminary opinion suggesting the further study that

resulted in the January 8th letter. In the December 5th letter, Valles noted that the '115 patent did not disclose titanium trichloride ("TiCl$_3$") in the specification but that a study of the file history is necessary to determine the meaning that Ziegler attaches to the term "titanium compounds." Basically, in Valles' view the question depended upon whether or not the '115 patent should be viewed as a pioneer patent.

The more complete opinion of January 8th concluded that Dart did not infringe the '115 patent. In reaching this conclusion, the Master found that Valles relied upon five main factors:

(a) non-disclosure of titanium trichloride anywhere by Ziegler,

(b) the showing by Hoechst that diethylaluminum monochlorine does not reduce titanium tetrachloride to a valence below 3,

(c) the refusal of the Patent Office to consider a claim by Ziegler for purposes of interference to a vanadium catalyst in a valence less than its maximum due to failure of Ziegler to disclose such,

(d) the failure of the Patent Office to declare an interference between the instant Ziegler patent and the Du Pont titanium trichloride patent, 3,050,471 ("'471"),

(e) the failure of the Patent Office to cite the Fischer reference, German patent 874,215.

DX732; Rep. at 31–32.

The Master's first ground for discounting the value of the January 8th letter, that it "is not definitive", is clearly erroneous. He bases this determination on the fact that Valles used the word "believed" several times in his opinion letter. That Valles used this word is of no real importance because Valles reached the definite conclusion that the '115 was not infringed. Also, whether or not the word "belief" appears in an opinion letter by counsel, any opinion letter is implicitly based upon that coun-

---

**15.** Though SGK did not formally object to the Master's finding that Dart management relied on Valles' letters, SGK contends in its briefing that Dart did not so rely. In addition to the procedural fact that SGK failed to raise the objection at the proper time in this proceeding, there are sufficient facts to support the Master's finding such that it cannot be termed clearly erroneous.

sel's belief. Moreover, as a matter of law, Dart is only required to "form[ ] a good faith belief that [the patent] was invalid or that it was not infringed." *Bott,* 807 F.2d at 1572; *Kloster Speedsteel,* 793 F.2d at 1581.

The Master also cited a statement by Valles in a letter to Mr. Reddy of Pennie & Edmonds, the outside law firm that eventually came to represent Dart in this litigation, that Valles' earlier opinions were "conclusions of [his] own....", DX976, for the proposition that Valles was admitting that his conclusions were bald and conclusory. Rep. at 32. There is nothing in Valles' comments that the conclusions were his own to support the Master's view that the conclusions were conclusory. Valles ultimate decision that the '115 was not infringed would have been a conclusion of his own whether based upon a year-long study of the '115 patent or upon no research at all. Valles' letter to Reddy simply stands as a summary of what Valles did. That he does not state the grounds for the conclusion in the letter to Reddy does not mean that the conclusions were unfounded. To discover whether the conclusions were bald and conclusory, the Master should not have placed any weight on this comment in the Reddy letter.

Because these comments by Valles do not support the Master's conclusions, the only remaining ground for the Master's determination is his substantive evaluation of the Valles' opinion. The Master found the Valles' letters to be "flawed" for several reasons. Rep. at 36. He found the letters to be conclusory, lacking reasons, analytical backup, and documented laboratory tests. He also found it improper for Valles to place reliance upon a rumored battle between Ziegler's patent and a Bayer—actually the Fischer—patent in Germany which never occurred. Last, the Master noted the failure to discuss the doctrine of reverse equivalents. *Id.*

In reaching these conclusions, the Master primarily relied upon the testimony of plaintiff's expert, Marvin Soffen. R. 7581–7615. Plaintiff's expert found that all the reasons listed in the Valles' letter were irrelevant on the issue of infringement. Soffen testified that the general disclosure of a tremendous number of titanium compounds meant that there was no need for a specific disclosure of $TiCl_3$. R. 7600. He also testified that the failure of the Patent Office to declare an interference with the Du Pont '471 patent, that Valles stated should have occurred, was irrelevant because the other patent was an improvement over the Ziegler patent. R. 7614.

The problem with these conclusions is not their factual accuracy, but the perspective from which they are made. When Soffen testified in 1986, he had the benefit of twenty-two years of scientific advances, this Court's Opinion in the liability trial, the Federal Circuit's affirmance, and the Fifth Circuit Opinion in the *Phillips* case. That the patent was ultimately held to be a valid, pioneer patent should not be relevant to what Valles did twenty-two years earlier. *Kloster Speedsteel,* 793 F.2d at 1581. Indeed, at trial, the Master noted his own reservation about the perspective of Soffen's testimony:

> But can you say that looking prospectively or can you say that only retrospectively, after there has been a determination? ... [Soffen answers, stating that the failure to hold an interference between the '471 and '115 is irrelevant because the '471 is an improvement patent over the basic '115 patent] ... I hate to prolong this, but let me ask you this. You're taking the advantage of the Fifth Circuit Opinion. R. 7612–7613

Soffen's response to this is that the *Phillips* case merely restated the prior case law on the issue, and apparently this satisfied the Master.

The problem with the Master's acceptance of Soffen's testimony is that the issue is not simply whether the *Phillips* opinion made new law on the issue of the relationship between an improvement patent and a pioneer patent. What is important for the willfulness determination is whether the '115 patent could in fact only be viewed as a pioneer patent in 1964. Subsequent judicial determinations that the '115 is a pioneer patent that will cover $TiCl_3$ cata-

lyst does not determine whether Valles' view that the patent did not cover the Dart catalyst was so incompetent that it justified a finding of willfulness.[16]

The Master misread the Valles letter of December 5, 1963 to conclude that the '115 was a pioneer invention. Rep. at 28. The Master quoted from the letter as follows:

These claims do not encompass titanium trichloride, by virtue of its having been described in the specifications, so that the question resolves itself as to whether Ziegler is entitled to such a compound due to the basic nature of the *pioneer invention* ... Briefly, from the review of the specifications and if this were not a pioneer invention, the question could easily be resolved. (emphasis added). *Id.*

The sentence in between the two cited by the Master reads: "A lot will therefore depend on the prosecution of the case through the Patent Office and on the various meanings attached by Ziegler to the term 'titanium compounds.'" *Id.* This middle sentence indicates that Valles' comments concerning the pioneer nature of the invention would not be definite until he had reviewed the file history. Valles also notes further in the same paragraph that there are reasons to doubt the equivalency of a titanium trichloride and a titanium tetrachloride catalyst. Valles' letter, written two days after the patent issued, is more a map of what he planned to do in the future to render an opinion rather than a statement of an opinion. The Master's finding that the "only reasonable assessment" of the December letter is that Valles viewed the patent as a pioneer patent, Rep. at 28, is clearly erroneous. In fact, the only reasonable assessment of the Valles' letter is that he was unsure of the patent's status and hoped to render a definitive opinion based upon an analysis of the file history.

Without the judicial determination that the patent is a pioneer patent, or the finding that Valles' first letter stated his view that the '115 was a pioneer patent, the rationale for Soffen's testimony is undercut. Though the claims in the patent were literally broad, the scope of any claim is defined by the file history. *Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d 861, 867 (Fed. Cir.1985). Valles informed Dart's management that, by looking through the file history, he limited the claims. Mr. Soffen acknowledged that titanium trichloride is not disclosed in the file history. R. 7628. Similarly, though today it may be clear that the Du Pont '471 patent is an improvement over the pioneer '115, it was not so clear in 1964. The Master was correct in questioning the perspective of Soffen's testimony, but he was clearly erroneous in accepting the answers Soffen gave, because those answers only responded with a statement of general principles of law; the only way that these rules of law can be applied to the '115 is after the determination that the patent is a pioneer patent.[17]

The chief sense in which the Master erred is that he failed to view the opinion letters from the perspective of Dart management. The cases on willful infringement evaluate the counsel's opinions from the perspective of a manager relying upon them. The factfinder's inquiry is to determine whether a manager can reasonably rely upon a counsel's opinion in determining how to respond to a patent. For example, the *Underwater Devices* court af-

---

**16.** That the scope of the '115 patent could be limited so as not to include all titanium salt catalysts or production of polypropylene is indicated by the district court opinion in *Ziegler v. Phillips Petroleum Co.*, 171 U.S.P.Q. 44 (N.D.Tex. 1971). The original complaint in *Ziegler* did not even allege infringement of the '115 patent. It was two years later, in 1969, that Ziegler alleged that the Phillips process infringed the '115. *Id.* Although the Fifth Circuit reversed the district court's finding, the fact remains that the issue of what the '115 covered was not as clear two decades ago as it is today. Moreover, this Court dedicated several pages of the liability opinion to the issue of the patent's pioneer status. 549 F.Supp. at 740–743. Again, this indicates that terming the '115 patent a "pioneer" patent is not an immediate conclusion.

**17.** This is not a finding that refutes the Master's determination that Soffen was credible. Rep. at 34. The Court is instead holding that the Master erred in relying upon testimony that has as its basic assumptions facts not known in the relevant time period.

firmed a willful infringement finding when the lawyer's opinion did not reference a file search and relied heavily on the fact that most patents are found invalid. The court ruled that management should not rely on such a speculative opinion. Other Federal Circuit cases also indicate that courts should evaluate whether the counsel's opinion, on its face, is one upon which it would be reasonable for management to rely. *See also Bott v. Four Star Co.*, 807 F.2d 1567, 1572 (holding no credible evidence proved the existence of a written opinion and no reasons given in oral opinion); *Kori Co. v. Wilco March Buggies & Draglines*, 761 F.2d 649, 656 (Fed.Cir.1985) (affirming willfulness finding based in part on an incompetent letter by counsel that stated, in full, "I have every reason to believe that the validity of the aforesaid patent cannot be maintained and that it will be declared null and void by the Court handling the litigation.")

In these cases, the opinions from counsel lacked any appearance of competence, authoritativeness or internal indicia of credibility—some of the important factors to consider when evaluating an opinion letter. *Radio Steel.* By contrast, the Valles' letter contains much more than unsupported conclusions. Valles referred to a file history search. He also discussed a Hoechst study and the '471 Du Pont patent as factors justifying distinguishing the Dart catalyst from the reach of the '115 patent.[18] Though Valles was ultimately shown to be incorrect, he presented scientific justifications for distinguishing between a titanium tetrachloride catalyst and a titanium trichloride catalyst. The Dart management knew that Valles had a good understanding of the Dart catalyst and what could distinguish it from the patent's claims. From the perspective of a Dart manager, these are significant, scientifically based reasons to justify the opinion. Valles applied the kind of analysis that would give a manager confidence that a proper opinion had been reached. Valles may have made errors in reaching his conclusion or in undertaking his analysis, but his opinion contains objective factors justifying it. Whether or not these factors later proved to be incorrect or, in the judgment of courts, insubstantial does not detract from the fact that at the time the decision not to license was made, the Dart management had within the "four corners [of Valles' letter] ... sufficient internal indicia of credibility." *Underwater Devices*, 717 F.2d at 1390, to justify Dart's reliance on Valles' opinion.[19]

Another important aspect of Valles' opinion, not stated by the Master, is Valles' view that Du Pont's '471 patent covered the Dart process and that "[w]e are actively negotiating for a license under this patent." DX732A at 2. Dart also took licenses from Hercules and Exxon. R. 643. In *King Instrument Co. v. Otari Co.*, 767 F.2d 853, 867 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986) the Federal Circuit stated that

**18.** The Master relied on testimony from one of Dart's experts, Mr. Modance, that the reason no interference was declared was that the interference search took place before the '471 patent issued. Tr. 10135. The Master also relied on the fact that a 1963 search gave "full faith and credit" to the earlier search; yet, Modance commented that he did not know "what the heck that [was] all about." Tr. 10,137. Last, the Master failed to consider the Patent Office procedure on interferences. The 1961 version of the M.P.E.P. § 1101.01(c) (3d Ed.1961) provided:

The search for interfering applications which is always made when preparing an application for allowance, but may be made at any time after a case has been found to contain allowable subject matter, must not be limited to the class or subclass in which it is classified, but must be extended to all classes in or out of the Examiner's division which it has been necessary to search in the examination of the application.

Because the '471 and the '115 were pending at the same time, Valles could reasonably have believed that there should have been an interference proceeding if the Patent Office believed that the two patents covered the same invention.

**19.** The Master found that the Valles' opinion lacked reasons to support his conclusions. On the face of Valles' letter scientific reasons are clearly stated. The only way the Master could reach his conclusion, then, is through Soffen's testimony that the reasons stated were irrelevant. Reliance on Soffen's testimony for that proposition is, as discussed above, clearly erroneous. Also, Soffen's testimony is in reality proof that Valles' reasons were wrong, not irrelevant.

one factor justifying a finding of non-willfulness is an infringer's reasonable belief that they were practicing under their own patent and not infringing the patentee's. Similarly, that an infringer believes that its process requires licenses under some patents but not others should be a strong factor militating against a willfulness finding. The *King* reasoning applies by analogy to a licensee because a licensee is acting under a claim of right based on a particular patent license in much the same way that a patentee acts under the rights given by the patent. Thus, SGK's reply to the argument raised with respect to *King,* that Dart's own Erchak patent did not issue until after the relevant time period, does not respond to the fact that Dart reasonably believed that it could produce polypropylene with certain licenses that did not include a license under the '115 patent. Also, from the perspective of a Dart manager, Valles' opinion letter indicates that he believed that Dart needed some licenses, albeit not a license on the '115, to produce polypropylene. Dart management could then be confident that Valles was taking an independent approach to the licensing issue.

### 3. *Dart's Post-Infringement Actions*

The third major area of the Master's willfulness discussion concerns Dart's post-infringement actions. Rep. at 37–41. Under the recent line of cases in the Federal Circuit beginning with *Underwater Devices* and *Central Soya,* an individual who has notice of the patent before beginning the potentially infringing act is under an affirmative duty of due care to ensure that the patent will not be infringed. In deciding to consider the post-infringement actions as part of the "totality of circumstances," the Master relied on *Underwater Devices:* "I note that in *Underwater Devices, supra,* counsel's advice was rendered after infringement commenced and even after suit was filed." Rep. at 37.

The problem with this rationale is that, though an opinion of counsel was received after infringement and after suit was filed in *Underwater Devices,* the Federal Circuit did not discuss that opinion when finding

willful infringement. The Federal Circuit noted that the infringing apparatus was used from August 15, 1974 to May 1, 1975 and that suit was filed on November 21, 1974. In ruling on the willfulness of the defendant's infringement, the Federal Circuit only evaluated the opinions that inside counsel made in December of 1973 and May of 1974, before infringement started. The Federal Circuit did not consider the quality of the outside counsel opinion eventually received: "Moreover, [defendant] did not receive the opinion of its patent counsel until November 30, 1974, long after infringement had commenced and even after the complaint for the instant case was filed." *Id.* at 1390.

The Master probably read *Underwater Devices* to allow him to look at post-infringement activities because, before analyzing the inside counsel's opinions, the Court commented that, "In this case, [defendant] obtained its counsel's advice *after* it commenced its infringing activities." *Id.* (emphasis in original). However, in the context of that paragraph and the remainder of the opinion, the quoted sentence appears to relate to that defendant's receipt of a competent opinion. First, the Federal Circuit observed that the defendant's inside counsel did not evaluate the validity or infringement before beginning the infringing activity because defendant's inside counsel did not receive the file history until after the infringement began. *Id.* Second, the Court only discussed the outside counsel opinion to note that it was received after infringement. *Id.* The only analyses that go into the substance of the opinions are with respect to those opinions that were written before infringement. The court in *Underwater Devices* did not consider the patent attorney's opinion rendered after suit was filed in much the same way that this Court should not consider the Pennie & Edmonds' opinion rendered five years after suit was filed. The proper reading of *Underwater Devices* is that only the pre-infringement opinions were relevant for the purposes of determining willfulness.

Defendant's reliance on *State Industries, Inc. v. A.O. Smith Corp.*, 751 F.2d 1226 (Fed.Cir.1985) for the proposition that a party's good faith reliance on counsel's advice rendered during the course of suit ends any possible charge of willfulness, is inapplicable to the instant case, because in *State Industries* the defendant began producing the infringing product before the patent issued and the defendant was not notified of the patent before the suit was filed. The affirmative duty present in *Underwater Devices* thus did not exist in *State Industries*.

This case differs from both *Underwater Devices* and *State Industries*, however. This distinction relates to the years between the start of Dart's infringement and the filing of suit. In that time period, Dart continued to monitor developments in the relevant field without any prompting from SGK. That Dart decided to pursue an outside counsel's opinion in 1967 because Ziegler sued Phillips indicates their continued monitoring of the patent. Though the Master found that Dean Laurence, then Dart's outside counsel, never rendered an oral opinion—a finding based on credibility determinations and not clearly erroneous— Dart's actions, especially the Valles' letter to Dean Laurence dated December 7, 1967, DX734, should be considered in the totality of the circumstances analysis. In a situation where a company determines that they do not infringe a patent and they are neither confronted with a lawsuit nor a threat of a lawsuit, the law should give the company an incentive to continue studying the decision not to get a license even after the onset of infringement. If, in Valles' further monitoring, he determined that Dart needed a '115 license, both SGK and Dart could have been saved the time and expense of litigation. If, however, as a matter of law, post-infringement activities could never be considered, there would be less of an incentive to continue studying the patent. In this case, no post-infringement, pre-suit opinion issued, but the Valles' letter to Laurence is relevant to an understanding of the depth of study Dart undertook in determining not to license under the '115.

■ Even without reference to post-infringement activities, this Court finds that the Master's determination that the infringement was willful is clearly erroneous. The Master erred in placing such great weight on Dart's decision to use inside counsel that he imposed a *per se* requirement on the company. The Master also erred in failing to read the Valles' opinions from the perspective of a Dart manager who received the opinion in 1964.

The above discussion illustrates the factors that the Master relied upon that were erroneous. The Master also failed to consider certain facts that should be considered in a totality of circumstances analysis. The Master failed to consider that Dart discovered the '115 patent on its own, decided not to take a license, and positively stated its position to Montecatini, Ziegler's agent. Neither Ziegler nor its agent contested that determination for several years.[20] The patentee's actions are a relevant consideration in the willfulness determination. *See,. e.g., State Industries, Inc. v. A.O. Smith Corp.*, 751 F.2d 1226 (Fed. Cir.1985) (noting that patentee never gave defendant notice prior to filing suit; Ziegler never sought a license from Dart nor gave Dart notice in the relevant 1964 time period); *American Original Corp. v. Jenkins Food Corp.*, 774 F.2d 459 (Fed.Cir. 1985) (approving different actions by defendant vis-a-vis different patentees; Dart acted differently with respect to Ziegler and Montecatini because of their different actions); *Underwater Devices*, 717 F.2d at 1384 (actual notice resulted from patentee's enforcement of patent rights, not diligence of defendant); *Kloster Speedsteel*, 793 F.2d at 1577 (failure to seek advice of counsel despite plaintiff's warnings). This is not a case where the patentee was vigorously enforcing its patent rights, or where the infringer chose to ignore the patent

---

20. That this Court rejected Dart's laches defense at the liability trial, 549 F.Supp. at 754, does not mean that it was unreasonable for Dart to consider SGK's non-response to Dart's decision to produce without a license in its decision to only use in-house counsel.

altogether. The Master erred in not considering this factor.

Last, a comparison of the facts in this case to those in others indicates that Dart's actions satisfied their duty. First, the opinion Dart used, unlike those used in *Underwater Devices, Bott,* or *Kori* contained sufficient data to indicate that it was reasonable for Dart's management to rely on Valles' opinions as credible and competent. Valles' opinion of January 8 contains more indicia of reliability than the oral opinion rendered in *Radio Steel,* a case in which a non-willfulness finding was upheld. *See also Rite-Hite Corp. v. Kelley Co.,* 819 F.2d 1120, 1124–25, 2 U.S.P.Q.2d 1915, 1918 (Fed.Cir.1987) (affirming finding of non-willfulness despite the fact that there was no opinion from counsel); *Ralston Purina Co. v. Far-Mar-Co., Inc.,* 772 F.2d 1570, 1577 (Fed.Cir.1985) (finding willfulness where company rejected license offer without even consulting in-house counsel); *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.,* 758 F.2d 613, 628 (Fed.Cir.), *cert. dismissed,* 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985) (affirming finding of no willfulness despite fact that defendant never received a counsel's opinion or took any actions with respect to patent); *Leinoff v. Louis Milona & Sons, Inc.,* 726 F.2d 734, 743 (Fed.Cir.1984) (affirming willfulness finding based upon defendant's failure to respond or consult an attorney despite receiving two letters from patentee, one offering a license and the other informing defendant of a decision in another relevant case).[21]

The Court finds, therefore, that the Master's finding of willfulness was clearly erroneous. Once the particular errors the Master made are corrected, the facts indicate that Dart made a good faith determination based upon an opinion from qualified counsel containing sufficient internal indicia of credibility such that Dart's infringement of the '115 patent was not willful. The award of enhanced damages is therefore reversed as an abuse of discretion.

## V. ATTORNEYS' FEES

Pursuant to 35 U.S.C. § 285 (1982), a court may award attorneys' fees to the prevailing party in exceptional patent cases. The Master awarded attorneys' fees to SGK based upon the willful infringement finding. "A finding of willful infringement meets the 'exceptional case' criterion of § 285." Rep. at 59 (citing, *inter alia, Shiley, Inc. v. Bentley Laboratories, Inc.,* 601 F.Supp. 964 (C.D.Cal.1985), *aff'd.,* 794 F.2d 1561 (Fed.Cir.1986); *S.C. Johnson & Son, Inc. v. Carter Wallace, Inc.,* 781 F.2d 198 (Fed.Cir.1986)). Because this Court has overturned the willfulness finding, there no longer is any justification for granting SGK its attorneys' fees. The Master made no finding of bad faith or inequitable conduct in prosecuting the case. Nothing in the record indicates otherwise. The Master's assessment of attorneys' fees is therefore reversed as an abuse of discretion.

## VI. PRE-JUDGMENT INTEREST

In a case that involves infringement for a time period commencing 23 years ago, it is not surprising that the issue of the proper rate of pre-judgment interest is of paramount importance in rendering a damage judgment. As of October 31, 1986, the interest portion of the judgment was $42,-688,410. The Master reached this award by assessing the prime rate compounded quarterly from the time of infringement.

The Master first held that SGK did not unduly delay in filing or litigating this action. He therefore held that interest should be awarded for the entire time period. Rep. at 47–54. The Master rejected the 6% simple interest Dart suggested because he found it to be unfair to SGK. Then, based upon the rates assessed in several District of Delaware cases and the

---

**21.** The Court is aware that in the majority of cases, the factfinder's determination on the willfulness issue is affirmed as not clearly erroneous. This is not true in every case, however. *See, State Industries, Inc. v. A.O. Smith Corp.,* 751 F.2d 1226 (Fed.Cir.1985); *Yarway Corp. v. Eur-Control U.S.A.,* 775 F.2d 268 (Fed.Cir.1985). In this case, the Court has found clear errors of fact and law in the Master's Report that justify reversing the willfulness determination.

testimony of plaintiff's expert, including reference to a book written by defendant's expert, the Master elected to use the prime rate, compounded quarterly. Rep. at 56. The Master also rejected Dart's claim that the interest payments should accrue sixty days after the conclusion of each quarter because the SGK license agreements provided for a sixty day grace period on the royalty payments. The Master rejected this contention, holding that interest should accrue from the date of infringement and no oral testimony had been presented on the grace period issue. Rep. at 59.

■ The Master's finding of no undue delay was not clearly erroneous. For the period before the filing of suit, the Master first relied upon the liability opinion's holding that SGK had no notice of Dart's infringement until January 1966 and that from January 1966 through August 1969, SGK only had constructive notice. Rep. at 50; 549 F.Supp. at 756–759. The Master then found that, because Dart presented no evidence that the delay between constructive notice and the filing of suit was either beneficial to SGK or harmful to Dart, he would not exercise his discretion to withhold interest or to reduce the interest rate for that time period. Rep. at 52. There is nothing to indicate that the Master's determination is either clearly erroneous or an abuse of discretion.

■ The same is true for Dart's claims of undue delay during the litigation itself. The Master found that the stay of the litigation pending conclusion of the *Phillips* case was in the interest of both parties. Dart has not demonstrated that this finding was clearly erroneous. The Master then properly exercised his discretion not to stop the accrual of interest. The Master finally found that the actual delay attributable to the *Kodak* litigation was only a few months. His citation to the extensive discovery ongoing in the Dart litigation indicates that he felt that the *Kodak* case did not unduly delay the instant case. Rep. at 53. Again, the determination is not clear error.

At oral argument, Dart's counsel cited *National R.R. Passenger Corp. v. New Castle County*, 636 F.Supp. 1482 (D.Del. 1986) for the proposition that "if there is any delay in the prosecution of the case, the defendant should not be tagged with interest during that period." Tr. at 71. In *National R.R.*, the Court held that only times where the plaintiff was "solely responsible" for delay would result in denying pre-judgment interest. 636 F.Supp. at 1489, n. 6. The Master did not find that SGK was solely responsible for delays in this case. Such a finding is not clearly erroneous.

■ Motivating the Master's view of these periods of delay is the purpose behind awards of pre-judgment interest. As the Supreme Court noted in *Devex*, the purpose for pre-judgment interest is to compensate the patentee, not to punish the infringer. *General Motors v. Devex*, 461 U.S. 648, 655, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983). The compensatory award represents monies that should have been paid to the patentee by the infringer long ago. Part of the patentee's harm, then, is loss of the use of that money. Payment of pre-judgment interest simply requires the infringer to pay back to the patentee the money that the infringer earned—the interest—on money that rightfully belonged to the patentee. "In light of [this] purpose, we conclude that pre-judgment interest should ordinarily be awarded." *Id.* It is only in special circumstances that pre-judgment interest should be denied. Under the circumstances in this case, the Court cannot say that the Master abused his discretion in awarding interest for the entire time period.

The defendant also appeals the rate the Master used to calculate the pre-judgment interest. The Supreme Court opinion in *Devex* did not discuss the factors involved in determining the proper interest rate. SGK contends that the Master properly exercised his discretion in awarding pre-judgment interest at prime compounded quarterly while Dart argues that the Master erred in awarding a higher rate of pre-judgment interest than the post-judgment interest rate codified in 28 U.S.C.

§ 1961, because he failed to find special circumstances.

 At the core of the debate between SGK and Dart is their differing interpretations of *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056 (Fed.Cir.1983). Dart reads *Lam* to require a finding of special circumstances to award an interest rate above the post-judgment statutory rate, while SGK interprets *Lam* to affirm the award of pre-judgment interest at prime and only requiring a finding of special circumstances to accrue interest at a rate higher than prime. In *Lam*, the Federal Circuit stated:

> The district court may "fix" the interest and select an award above the statutory rate, *see, Underwater Devices*, 217 U.S.P.Q. [1039] at 1065, or select an award at the prime rate. *Cf. General Facilities, Inc. v. National Marine Service, Inc.*, 664 F.2d 672, 674 (8th Cir. 1981) (discretionary award of prejudgment interest at the prime rate in an admiralty action). Once the claimant has affirmatively demonstrated that a higher rate should be used, *cf. Decca, Ltd. v. United States*, 640 F.2d 1156, 1168, 225 Ct.Cl. 326, 335, 209 U.S.P.Q. 52, 61 (1980), *cert. denied*, 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981) (8% interest in a 28 U.S.C. § 1498 action), the district court may fix the interest at that higher rate. 718 F.2d at 1066.

Based upon the cases cited within the above quoted provision in *Lam* and later Federal Circuit cases, the Court finds that SGK's reading of *Lam* is the proper one. In *Underwater Devices*, the District Court interpreted 35 U.S.C. § 284 to authorize an award of the commercial rate of interest, rather than an award at the statutory rate. 217 U.S.P.Q. 1038, 1065 (D.Hi.1982). No particular factual findings were made to justify this; yet, the Federal Circuit apparently approved of this approach in *Lam*. Second, the Federal Circuit cited to *Decca*

where affirmative facts were needed to charge a higher rate of interest.[22] Yet, in *Decca*, the starting point for the interest calculation was not a statutory rate, or even a government bond rate, but was a commercially based rate. *See Pitcairn v. United States*, 212 Ct.Cl. 168, 547 F.2d 1106 (1977), *cert. denied*, 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978). From a reading of the case law cited within *Lam*, then, the Court finds that an affirmative showing is required if the factfinder is to assess a rate higher than one justified by market conditions.

 Subsequent Federal Circuit cases support this interpretation. In *Gyromat v. Champion Spark Plug Co.*, 735 F.2d 549 (Fed.Cir.1984), the Court noted:

> This court has recognized that the district court has substantial discretion to determine the interest rate in patent infringement cases. *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506 (Fed.Cir.1984); *see also Lam, supra*. In *Railroad Dynamics*, we upheld a district court's award of interest at the prime rate. In both cases, the basis of our decision was that it had not been shown that the district court abused its discretion in setting the rate. *Id.* at 556.

The Federal Circuit itself thus reads *Lam* to stand for the proposition that the district court, or factfinder, has broad discretion even in awarding pre-judgment interest at the prime rate. The *Gyromat* court also held that it was within the discretion of the district court to determine whether compound or simple interest should be used. *Id.* at 557. *See Trans-World Mfg. Corp. v. Al Nyman & Sons*, 633 F.Supp. 1047 (D.Del.1986) (holding that the district court has discretion to set the interest rate and applying the rate established in 26 U.S.C. § 6621 on a daily compounding basis). Because the Court rejects the interpretation given *Lam* by the defendant,[23] the Court

---

**22.** *Decca* is not directly on point because interest and damages were sought from the government in that case. Thus, 28 U.S.C. § 1498 (1982) stood as the starting point for the damages discussion.

**23.** Defendants cite to *Schering Corp. v. Precision-Cosmet*, 614 F.Supp. 1368 (D.Del.1985) to support their interpretation. Though that opinion apparently supports their contention, this Court finds that both the cases cited within *Lam* and subsequent cases applying *Lam* support the

finds that the Master's award of interest at the prime rate compounded quarterly is not an abuse of discretion.

■ The Master cited to relevant Delaware case law [24] and the expert testimony to justify his decision to assess interest at the prime rate compounded quarterly. The Court does not find persuasive Dart's argument that SGK's license agreement that assessed a 6% simple interest charge renders the Master's determination an abuse of discretion. First, the particular interest rate agreed upon in the other negotiations was agreed upon at a time when interest rates were different than they are today. That interest was not compounded in the agreements could logically reflect the fact that SGK did not contemplate non-payment for such a long period of time; the distinction between simple and compound interest would then be unimportant. Most important, however, is that the pre-judgment interest assessment is meant to be a form of compensation for the lost use of money and does not necessarily relate back to what kind of late payment terms the parties would have agreed to. The Master's finding that pre-judgment interest should be applied at the prime rate compounded quarterly will be affirmed.

The final question to be answered in the pre-judgment interest section of this Opinion is the question of timing: from what date should interest begin to accrue? Either the Court can affirm the Master's decision to start interest accrual at the end of each calendar quarter (infringing period), or the Court can delay interest accrual to 60 days after the conclusion of each calendar quarter, as defendant proposes. Defendants base their argument on provisions in the license agreements and in the actual payment history of Hercules and Exxon to justify the delay in interest accrual.

■ The Master's decision to accrue interest from the first day after the end of each calendar quarter was not an abuse of discretion. Because the Master found that the existing licenses did not establish a royalty rate, he was justified in finding that, "It would be inequitable to permit defendant to take advantage of favorable licenses negotiated by other parties." Rep. at 59. This logic is similar to the logic used in rejecting negotiated interest rates as setting the appropriate pre-judgment interest rate. The Master was justified in ruling that there was insufficient evidence to distinguish between the date of infringement and the date of payment. Also, relevant Supreme Court precedent does not distinguish between the date of payment and the date of infringement. *See, Devex,* 461 U.S. at 655–656, 103 S.Ct. at 2062; *Aro Manufacturing Co. v. Convertible Top. Co.,* 377 U.S. 476, 505–506, 84 S.Ct. 1526, 1542, 12 L.Ed.2d 457 (1964). This aspect of the Master's decision will be affirmed.

The Court therefore finds that to fairly compensate SGK pre-judgment interest must be assessed at the prime rate compounded quarterly and that interest should accrue at the end of each infringing period.

## VII. CONCLUSION

Upon reviewing the Special Master's report, the Court has found clearly erroneous findings of fact and errors of law. This Court will, therefore, modify the Master's recommendations. First, Dart will be assessed royalties at a rate of 2.5% on total net sales of $454,234,000.00. Dart is deemed to have paid $1.18 million dollars up-front, which is to be creditable against future royalties at the rate of 50% of each

---

interpretation SGK has given the *Lam* opinion. This Court, in *Trans-World v. Al Nyman,* weighed the facts, and, citing *Lam,* applied a version of the prime rate without making particular findings. Sitting as a reviewing court, the Court finds that the decision as to what factors result in what particular rate of interest to apply lie in the province of the factfinding court. If the factfinder intends to charge interest at a rate greater than the prime rate, special factors need to be found.

**24.** *Scott Paper Co. v. Moore Business Forms,* 594 F.Supp. 1051 (D.Del.1984) (prime rate); *Devex v. General Motors Corporation,* 494 F.Supp. 1369 (D.Del.1980) (Moody's corporate bond rate); *Schering Corp. v. Precision-Cosmet Co.,* 614 F.Supp. 1368 (D.Del.1985) (post-judgment rate— 52 week treasury bill rate); *TWM v. Al Nyman* (adjusted prime rate pursuant to 26 U.S.C. § 6621).

year's royalties until the up-front payment is exhausted. Pre-judgment interest is to be assessed at the prime rate compounded quarterly, with the accrual of interest to commence on the first day after the conclusion of each quarterly infringing period. SGK will not be awarded attorneys' fees or enhanced damages.

An Order will enter in conformity with this Opinion.